# MITSUBISHI MOTORS CORP. *v.* SOLER CHRYSLER-PLYMOUTH, INC.

No. 83–1569.   Argued March 18, 1985—Decided July 2, 1985*

---

*Together with No. 83–1733, *Soler Chrysler-Plymouth, Inc.* v. *Mitsubishi Motors Corp.*, also on certiorari to the same court.

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in which MARSHALL, J., joined except as to Part II, *post*, p. 640. POWELL, J., took no part in the decision of the cases.

*Wayne A. Cross* argued the cause for petitioner in No. 83–1569 and respondent in No. 83–1733. With him on the briefs were *Robert L. Sills, William I. Sussman, Samuel T. Cespedes,* and *Ana Matilde Nin.*

*Benjamin Rodriguez-Ramon* argued the cause for respondent in No. 83–1569 and petitioner in No. 83–1733. With him on the briefs was *Jerome Murray.*

*Jerrold Joseph Ganzfried* argued the cause for the United States as *amicus curiae* supporting respondent in No. 83–1569. With him on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Carolyn F. Corwin, Robert B. Nicholson,* and *Marion L. Jetton.\**

JUSTICE BLACKMUN delivered the opinion of the Court.

The principal question presented by these cases is the arbitrability, pursuant to the Federal Arbitration Act, 9 U. S. C. § 1 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), [1970] 21 U. S. T. 2517, T. I. A. S. No. 6997, of claims arising under the Sherman Act, 15 U. S. C. § 1 *et seq.*, and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction.

## I

Petitioner-cross-respondent Mitsubishi Motors Corporation (Mitsubishi) is a Japanese corporation which manufactures automobiles and has its principal place of business in Tokyo, Japan. Mitsubishi is the product of a joint venture between, on the one hand, Chrysler International, S. A. (CISA), a Swiss corporation registered in Geneva and wholly owned by Chrysler Corporation, and, on the other, Mitsubishi Heavy Industries, Inc., a Japanese corporation. The

---

\*Briefs of *amici curiae* urging reversal were filed for the American Arbitration Association by *Michael F. Hoellering, Joseph T. McLaughlin, Wayne D. Collins, Alfred Ferrer, Rosemary S. Page, Thomas Thacher, John R. Stevenson, Robert B. von Mehren, Gerald Aksen, Henry P. de Vries, Andreas F. Lowenfeld,* and *J. Stewart McClendon;* and for the National Automobile Dealers Association by *Jerry S. Cohen.*

Briefs of *amici curiae* were filed for the International Chamber of Commerce by *James S. Campbell* and *Andrew N. Vollmer;* and for the Commonwealth of Puerto Rico by *Hector Rivera Cruz,* Secretary of Justice of Puerto Rico, *E. Edward Bruce,* and *Oscar M. Garibaldi.*

aim of the joint venture was the distribution through Chrysler dealers outside the continental United States of vehicles manufactured by Mitsubishi and bearing Chrysler and Mitsubishi trademarks. Respondent-cross-petitioner Soler Chrysler-Plymouth, Inc. (Soler), is a Puerto Rico corporation with its principal place of business in Pueblo Viejo, Guaynabo, Puerto Rico.

On October 31, 1979, Soler entered into a Distributor Agreement with CISA which provided for the sale by Soler of Mitsubishi-manufactured vehicles within a designated area, including metropolitan San Juan. App. 18. On the same date, CISA, Soler, and Mitsubishi entered into a Sales Procedure Agreement (Sales Agreement) which, referring to the Distributor Agreement, provided for the direct sale of Mitsubishi products to Soler and governed the terms and conditions of such sales. *Id.*, at 42. Paragraph VI of the Sales Agreement, labeled "Arbitration of Certain Matters," provides:

> "All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to Articles I–B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." *Id.*, at 52–53.

Initially, Soler did a brisk business in Mitsubishi-manufactured vehicles. As a result of its strong performance, its minimum sales volume, specified by Mitsubishi and CISA, and agreed to by Soler, for the 1981 model year was substantially increased. *Id.*, at 179. In early 1981, however, the new-car market slackened. Soler ran into serious difficulties in meeting the expected sales volume, and by the spring of 1981 it felt itself compelled to request that Mitsubishi delay or cancel shipment of several orders. 1 Record 181, 183. About the same time, Soler attempted to arrange for the

transshipment of a quantity of its vehicles for sale in the continental United States and Latin America. Mitsubishi and CISA, however, refused permission for any such diversion, citing a variety of reasons,[1] and no vehicles were transshipped. Attempts to work out these difficulties failed. Mitsubishi eventually withheld shipment of 966 vehicles, apparently representing orders placed for May, June, and July 1981 production, responsibility for which Soler disclaimed in February 1982. App. 131.

The following month, Mitsubishi brought an action against Soler in the United States District Court for the District of Puerto Rico under the Federal Arbitration Act and the Convention.[2] Mitsubishi sought an order, pursuant to 9 U. S. C. §§ 4 and 201,[3] to compel arbitration in accord with

---

[1] The reasons advanced included concerns that such diversion would interfere with the Japanese trade policy of voluntarily limiting imports to the United States, App. 143, 177–178; that the Soler-ordered vehicles would be unsuitable for use in certain proposed destinations because of their manufacture, with use in Puerto Rico in mind, without heaters and defoggers, *id.*, at 182; that the vehicles would be unsuitable for use in Latin America because of the unavailability there of the unleaded, high-octane fuel they required, *id.*, at 177, 181–182; that adequate warranty service could not be ensured, *id.*, at 176, 182; and that diversion to the mainland would violate contractual obligations between CISA and Mitsubishi, *id.*, at 144, 183.

[2] The complaint alleged that Soler had failed to pay for 966 ordered vehicles; that it had failed to pay contractual "distress unit penalties," intended to reimburse Mitsubishi for storage costs and interest charges incurred because of Soler's failure to take shipment of ordered vehicles; that Soler's failure to fulfill warranty obligations threatened Mitsubishi's reputation and goodwill; that Soler had failed to obtain required financing; and that the Distributor and Sales Agreements had expired by their terms or, alternatively, that Soler had surrendered its rights under the Sales Agreement. *Id.*, at 11–14.

[3] Section 4 provides in pertinent part:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for

¶ VI of the Sales Agreement. App. 15.[4] Shortly after filing the complaint, Mitsubishi filed a request for arbitration before the Japan Commercial Arbitration Association. *Id.*, at 70.

Soler denied the allegations and counterclaimed against both Mitsubishi and CISA. It alleged numerous breaches by Mitsubishi of the Sales Agreement,[5] raised a pair of defamation claims,[6] and asserted causes of action under the Sher-

_____

in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."

Section 201 provides: "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." Article II of the Convention, in turn, provides:

"1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

. . . . .

"3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." 21 U. S. T., at 2519. Title 9 U. S. C. § 203 confers jurisdiction on the district courts of the United States over an action falling under the Convention.

[4] Mitsubishi also sought an order against threatened litigation. App. 15–16.

[5] The alleged breaches included wrongful refusal to ship ordered vehicles and necessary parts, failure to make payment for warranty work and authorized rebates, and bad faith in establishing minimum-sales volumes. *Id.*, at 97–101.

[6] The fourth counterclaim alleged that Mitsubishi had made statements that defamed Soler's good name and business reputation to a company with which Soler was then negotiating the sale of its plant and distributorship. *Id.*, at 96. The sixth counterclaim alleged that Mitsubishi had made a willfully false and malicious statement in an affidavit submitted in support of

man Act, 15 U. S. C. § 1 *et seq.;* the federal Automobile Dealers' Day in Court Act, 70 Stat. 1125, 15 U. S. C. § 1221 *et seq.;* the Puerto Rico competition statute, P. R. Laws Ann., Tit. 10, § 257 *et seq.* (1976); and the Puerto Rico Dealers' Contracts Act, P. R. Laws Ann., Tit. 10, § 278 *et seq.* (1976 and Supp. 1983). In the counterclaim premised on the Sherman Act, Soler alleged that Mitsubishi and CISA had conspired to divide markets in restraint of trade. To effectuate the plan, according to Soler, Mitsubishi had refused to permit Soler to resell to buyers in North, Central, or South America vehicles it had obligated itself to purchase from Mitsubishi; had refused to ship ordered vehicles or the parts, such as heaters and defoggers, that would be necessary to permit Soler to make its vehicles suitable for resale outside Puerto Rico; and had coercively attempted to replace Soler and its other Puerto Rico distributors with a wholly owned subsidiary which would serve as the exclusive Mitsubishi distributor in Puerto Rico. App. 91–96.

After a hearing, the District Court ordered Mitsubishi and Soler to arbitrate each of the issues raised in the complaint and in all the counterclaims save two and a portion of a third.[7] With regard to the federal antitrust issues, it recognized that the Courts of Appeals, following *American Safety Equip-*

its application for a temporary restraining order, and that Mitsubishi had wrongfully advised Soler's customers and the public in its market area that they should no longer do business with Soler. *Id.,* at 98–99.

[7] The District Court found that the arbitration clause did not cover the fourth and sixth counterclaims, which sought damages for defamation, see n. 6, *supra,* or the allegations in the seventh counterclaim concerning discriminatory treatment and the establishment of minimum-sales volumes. App. to Pet. for Cert. in No. 83–1569, pp. B10–B11. Accordingly, it retained jurisdiction over those portions of the litigation. In addition, because no arbitration agreement between Soler and CISA existed, the court retained jurisdiction, insofar as they sought relief from CISA, over the first, second, third, and ninth counterclaims, which raised claims under the Puerto Rico Dealers' Contracts Act, the federal Automobile Dealers' Day in Court Act, the Sherman Act, and the Puerto Rico competition statute, respectively. *Id.,* at B12. These aspects of the District Court's ruling were not appealed and are not before this Court.

*ment Corp.* v. *J. P. Maguire & Co.*, 391 F. 2d 821 (CA2 1968), uniformly had held that the rights conferred by the antitrust laws were "'of a character inappropriate for enforcement by arbitration.'" App. to Pet. for Cert. in No. 83–1569, p. B9, quoting *Wilko* v. *Swan*, 201 F. 2d 439, 444 (CA2 1953), rev'd, 346 U. S. 427 (1953). The District Court held, however, that the international character of the Mitsubishi-Soler undertaking required enforcement of the agreement to arbitrate even as to the antitrust claims. It relied on *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 515–520 (1974), in which this Court ordered arbitration, pursuant to a provision embodied in an international agreement, of a claim arising under the Securities Exchange Act of 1934 notwithstanding its assumption, *arguendo*, that *Wilko, supra*, which held non-arbitrable claims arising under the Securities Act of 1933, also would bar arbitration of a 1934 Act claim arising in a domestic context.

The United States Court of Appeals for the First Circuit affirmed in part and reversed in part. 723 F. 2d 155 (1983). It first rejected Soler's argument that Puerto Rico law precluded enforcement of an agreement obligating a local dealer to arbitrate controversies outside Puerto Rico.[8] It also rejected Soler's suggestion that it could not have intended to arbitrate statutory claims not mentioned in the arbitration agreement. Assessing arbitrability "on an allegation-by-allegation basis," *id.*, at 159, the court then read the arbitra-

---

[8] Soler relied on P. R. Laws Ann., Tit. 10, § 278b–2 (Supp. 1983), which purports to render null and void "[a]ny stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract outside of Puerto Rico, or under foreign law or rule of law." See *Walborg Corp.* v. *Superior Court*, 104 P. R. R. 258 (1975). The Court of Appeals held this provision pre-empted by 9 U. S. C. § 2, which declares arbitration agreements valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 723 F. 2d, at 158. See *Southland Corp.* v. *Keating*, 465 U. S. 1 (1984). See also *Ledee* v. *Ceramiche Ragno*, 684 F. 2d 184 (CA1 1982). Soler does not challenge this holding in its cross-petition here.

tion clause to encompass virtually all the claims arising under the various statutes, including all those arising under the Sherman Act.[9]

---

[9] As the Court of Appeals saw it, "[t]he question . . . is not whether the arbitration clause mentions antitrust or any other particular cause of action, but whether the factual allegations underlying Soler's counterclaims—and Mitsubishi's bona fide defenses to those counterclaims—are within the scope of the arbitration clause, whatever the legal labels attached to those allegations." 723 F. 2d, at 159. Because Soler's counterclaim under the Puerto Rico Dealers' Contracts Act focused on Mitsubishi's alleged failure to comply with the provisions of the Sales Agreement governing delivery of automobiles, and those provisions were found in that portion of Article I of the Agreement subject to arbitration, the Court of Appeals placed this first counterclaim within the arbitration clause. Id., at 159–160.

The court read the Sherman Act counterclaim to raise issues of wrongful termination of Soler's distributorship, wrongful failure to ship ordered parts and vehicles, and wrongful refusal to permit transshipment of stock to the United States and Latin America. Because the existence of just cause for termination turned on Mitsubishi's allegations that Soler had breached the Sales Agreement by, for example, failing to pay for ordered vehicles, the wrongful termination claim implicated at least three provisions within the arbitration clause: Article I–D(1), which rendered a dealer's orders "firm"; Article I–E, which provided for "distress unit penalties" where the dealer prevented timely shipment; and Article I–F, specifying payment obligations and procedures. The court therefore held the arbitration clause to cover this dispute. Because the nonshipment claim implicated Soler's obligation under Article I–F to proffer acceptable credit, the court found this dispute covered as well. And because the transshipment claim prompted Mitsubishi defenses concerning the suitability of vehicles manufactured to Soler's specifications for use in different locales and Soler's inability to provide warranty service to transshipped products, it implicated Soler's obligation under Article IV, another covered provision, to make use of Mitsubishi's trademarks in a manner that would not dilute Mitsubishi's reputation and goodwill or damage its name and reputation. The court therefore found the arbitration agreement also to include this dispute, noting that such trademark concerns "are relevant to the legality of territorially based restricted distribution arrangements of the sort at issue here." 723 F. 2d, at 160–161, citing Continental T. V., Inc. v. GTE Sylvania Inc., 433 U. S. 36 (1977).

The Court of Appeals read the federal Automobile Dealers' Day in Court Act claim to raise issues as to Mitsubishi's good faith in establishing

Finally, after endorsing the doctrine of *American Safety*, precluding arbitration of antitrust claims, the Court of Appeals concluded that neither this Court's decision in *Scherk* nor the Convention required abandonment of that doctrine in the face of an international transaction. 723 F. 2d, at 164–168. Accordingly, it reversed the judgment of the District Court insofar as it had ordered submission of "Soler's antitrust claims" to arbitration.[10] Affirming the remainder of the judgment,[11] the court directed the District Court to consider in the first instance how the parallel judicial and arbitral proceedings should go forward.[12]

---

minimum-sales volumes and Mitsubishi's alleged attempt to coerce Soler into accepting replacement by a Mitsubishi subsidiary. It agreed with the District Court's conclusion, in which Mitsubishi acquiesced, that the arbitration clause did not reach the first issue; it found the second, arising from Soler's payment problems, to restate claims already found to be covered. 723 F. 2d, at 161.

Finally, the Court of Appeals found the antitrust claims under Puerto Rico law entirely to reiterate claims elsewhere stated; accordingly, it held them arbitrable to the same extent as their counterparts. *Ibid.*

[10] Soler suggests that the court thereby declared antitrust claims arising under Puerto Rico law nonarbitrable as well. We read the Court of Appeals' opinion to have held only the federal antitrust claims nonarbitrable. See *id.*, at 157 ("principal issue on this appeal is whether arbitration of federal antitrust claims may be compelled under the Federal Arbitration Act"); *id.*, at 161 ("major question in this appeal is whether the antitrust issues raised by Soler's third counterclaim [grounded on Sherman Act] are subject to arbitration"). In any event, any contention that the local antitrust claims are nonarbitrable would be foreclosed by this Court's decision in *Southland Corp.* v. *Keating*, 465 U. S., at 10, where we held that the Federal Arbitration Act "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."

[11] In this Court, Soler suggests for the first time that Congress intended that claims under the federal Automobile Dealers' Day in Court Act be nonarbitrable. Brief for Respondent and Cross-Petitioner 21, n. 12. Because Soler did not raise this question in the Court of Appeals or present it in its cross-petition, we do not address it here.

[12] Following entry of the District Court's judgment, both it and the Court of Appeals denied motions by Soler for a stay pending appeal. The parties

624

We granted certiorari primarily to consider whether an American court should enforce an agreement to resolve antitrust claims by arbitration when that agreement arises from an international transaction. 469 U. S. 916 (1984).

II

At the outset, we address the contention raised in Soler's cross-petition that the arbitration clause at issue may not be read to encompass the statutory counterclaims stated in its answer to the complaint. In making this argument, Soler does not question the Court of Appeals' application of ¶ VI of the Sales Agreement to the disputes involved here as a matter of standard contract interpretation.[13] Instead, it argues

accordingly commenced preparation for the arbitration in Japan. Upon remand from the Court of Appeals, however, Soler withdrew the antitrust claims from the arbitration tribunal and sought a stay of arbitration pending the completion of the judicial proceedings on the ground that the antitrust claims permeated the claims that remained before that tribunal. The District Court denied the motion, instead staying its own proceedings pending the arbitration in Japan. The arbitration recommenced, but apparently came to a halt once again in September 1984 upon the filing by Soler of a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U. S. C. § 1101 et seq.

[13] We therefore have no reason to review the Court of Appeals' construction of the scope of the arbitration clause in the light of the allegations of Soler's counterclaims. See n. 9, supra; Southland Corp. v. Keating, 465 U. S., at 15, n. 7.

Soler does suggest that, because the title of the clause referred only to "certain matters," App. 52, and the clause itself specifically referred only to "Articles I–B through V," ibid., it should be read narrowly to exclude the statutory claims. Soler ignores the inclusion within those "certain matters" of "[a]ll disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to [the specified provisions] or for the breach thereof." Contrary to Soler's suggestion, the exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to operate. Thus, insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability. See 723 F. 2d, at 159.

that as a matter of law a court may not construe an arbitration agreement to encompass claims arising out of statutes designed to protect a class to which the party resisting arbitration belongs "unless [that party] has expressly agreed" to arbitrate those claims, see Pet. for Cert. in No. 83–1733, pp. 8, i, by which Soler presumably means that the arbitration clause must specifically mention the statute giving rise to the claims that a party to the clause seeks to arbitrate. See 723 F. 2d, at 159. Soler reasons that, because it falls within the class for whose benefit the federal and local antitrust laws and dealers' Acts were passed, but the arbitration clause at issue does not mention these statutes or statutes in general, the clause cannot be read to contemplate arbitration of these statutory claims.

We do not agree, for we find no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims. The Act's centerpiece provision makes a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce . . . valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2. The "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 24 (1983), manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Id.*, at 25, n. 32.[14] As this Court recently observed, "[t]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered,"

---

[14] The Court previously has explained that the Act was designed to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law. See *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 219–221, and n. 6 (1985); *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 510, and n. 4 (1974).

a concern which "requires that we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 221 (1985).

Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital*, 460 U. S., at 24. See *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 400–404 (1967); *Southland Corp.* v. *Keating*, 465 U. S. 1, 12 (1984). And that body of law counsels

> "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital*, 460 U. S., at 24–25.

See, *e. g.*, *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582–583 (1960). Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.

There is no reason to depart from these guidelines where a party bound by an arbitration agreement raises claims founded on statutory rights. Some time ago this Court expressed "hope for [the Act's] usefulness both in controversies based on statutes or on standards otherwise created," *Wilko* v. *Swan*, 346 U. S. 427, 432 (1953) (footnote omitted); see *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware*, 414 U. S. 117, 135, n. 15 (1973), and we are well past the time

when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution. Just last Term in *Southland Corp.*, *supra*, where we held that § 2 of the Act declared a national policy applicable equally in state as well as federal courts, we construed an arbitration clause to encompass the disputes at issue without pausing at the source in a state statute of the rights asserted by the parties resisting arbitration. 465 U. S., at 15, and n. 7.[15] Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." 9 U. S. C. § 2; see *Southland Corp.*, 465 U. S., at 16, n. 11; *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1, 15 (1972). But, absent such compelling considerations, the Act itself provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.

That is not to say that all controversies implicating statutory rights are suitable for arbitration. There is no reason to distort the process of contract interpretation, however, in order to ferret out the inappropriate. Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable.

---

[15] The claims whose arbitrability was at issue in *Southland Corp.* arose under the disclosure requirements of the California Franchise Investment Law, Cal. Corp. Code Ann. § 31000 *et seq.* (West 1977). While the dissent in *Southland Corp.* disputed the applicability of the Act to proceedings in the state courts, it did not object to the Court's reading of the arbitration clause under examination.

See *Wilko* v. *Swan*, 346 U. S., at 434–435; *Southland Corp.*, 465 U. S., at 16, n. 11; *Dean Witter Reynolds Inc.*, 470 U. S., at 224–225 (concurring opinion). For that reason, Soler's concern for statutorily protected classes provides no reason to color the lens through which the arbitration clause is read. By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. See *Wilko* v. *Swan*, *supra*. Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. Nothing, in the meantime, prevents a party from excluding statutory claims from the scope of an agreement to arbitrate. See *Prima Paint Corp.*, 388 U. S., at 406.

In sum, the Court of Appeals correctly conducted a two-step inquiry, first determining whether the parties' agreement to arbitrate reached the statutory issues, and then, upon finding it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims. We endorse its rejection of Soler's proposed rule of arbitration-clause construction.

### III

We now turn to consider whether Soler's antitrust claims are nonarbitrable even though it has agreed to arbitrate them. In holding that they are not, the Court of Appeals followed the decision of the Second Circuit in *American Safety Equipment Corp.* v. *J. P. Maguire & Co.*, 391 F. 2d 821 (1968). Notwithstanding the absence of any explicit support

for such an exception in either the Sherman Act or the Federal Arbitration Act, the Second Circuit there reasoned that "the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make . . . antitrust claims . . . inappropriate for arbitration." *Id.*, at 827–828. We find it unnecessary to assess the legitimacy of the *American Safety* doctrine as applied to agreements to arbitrate arising from domestic transactions. As in *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974), we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context.

Even before *Scherk*, this Court had recognized the utility of forum-selection clauses in international transactions. In *The Bremen, supra,* an American oil company, seeking to evade a contractual choice of an English forum and, by implication, English law, filed a suit in admiralty in a United States District Court against the German corporation which had contracted to tow its rig to a location in the Adriatic Sea. Notwithstanding the possibility that the English court would enforce provisions in the towage contract exculpating the German party which an American court would refuse to enforce, this Court gave effect to the choice-of-forum clause. It observed:

> "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." 407 U. S., at 9.

Recognizing that "agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting," *id.*, at 13–14, the decision in *The Bremen* clearly eschewed a provincial solicitude for the jurisdiction of domestic forums.

Identical considerations governed the Court's decision in *Scherk*, which categorized "[a]n agreement to arbitrate before a specified tribunal [as], in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." 417 U. S., at 519. In *Scherk*, the American company Alberto-Culver purchased several interrelated business enterprises, organized under the laws of Germany and Liechtenstein, as well as the rights held by those enterprises in certain trademarks, from a German citizen who at the time of trial resided in Switzerland. Although the contract of sale contained a clause providing for arbitration before the International Chamber of Commerce in Paris of "any controversy or claim [arising] out of this agreement or the breach thereof," Alberto-Culver subsequently brought suit against Scherk in a Federal District Court in Illinois, alleging that Scherk had violated § 10(b) of the Securities Exchange Act of 1934 by fraudulently misrepresenting the status of the trademarks as unencumbered. The District Court denied a motion to stay the proceedings before it and enjoined the parties from going forward before the arbitral tribunal in Paris. The Court of Appeals for the Seventh Circuit affirmed, relying on this Court's holding in *Wilko* v. *Swan*, 346 U. S. 427 (1953), that agreements to arbitrate disputes arising under the Securities Act of 1933 are nonarbitrable. This Court reversed, enforcing the arbitration agreement even while assuming for purposes of the decision that the controversy would be nonarbitrable under the holding of *Wilko* had it arisen out of a domestic transaction. Again, the Court emphasized:

"A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. . . .

"A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages. . . . [It would] damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." 417 U. S., at 516–517.

Accordingly, the Court held Alberto-Culver to its bargain, sending it to the international arbitral tribunal before which it had agreed to seek its remedies.

*The Bremen* and *Scherk* establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions. Here, as in *Scherk*, that presumption is reinforced by the emphatic federal policy in favor of arbitral dispute resolution. And at least since this Nation's accession in 1970 to the Convention, see [1970] 21 U. S. T. 2517, T. I. A. S. 6997, and the implementation of the Convention in the same year by amendment of the Federal Arbitration Act,[16] that federal policy applies with special force in the field of international commerce. Thus, we must weigh the concerns of *American Safety* against a strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes and an equal commitment to the enforcement of freely negotiated choice-of-forum clauses.

---

[16] Act of July 31, 1970, Pub. L. 91–368, 84 Stat. 692, codified at 9 U. S. C. §§ 201–208.

At the outset, we confess to some skepticism of certain aspects of the *American Safety* doctrine. As distilled by the First Circuit, 723 F. 2d, at 162, the doctrine comprises four ingredients. First, private parties play a pivotal role in aiding governmental enforcement of the antitrust laws by means of the private action for treble damages. Second, "the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract." Third, antitrust issues, prone to complication, require sophisticated legal and economic analysis, and thus are "ill-adapted to strengths of the arbitral process, *i. e.*, expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity." Finally, just as "issues of war and peace are too important to be vested in the generals, . . . decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community—particularly those from a foreign community that has had no experience with or exposure to our law and values." See *American Safety*, 391 F. 2d, at 826–827.

Initially, we find the second concern unjustified. The mere appearance of an antitrust dispute does not alone warrant invalidation of the selected forum on the undemonstrated assumption that the arbitration clause is tainted. A party resisting arbitration of course may attack directly the validity of the agreement to arbitrate. See *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967). Moreover, the party may attempt to make a showing that would warrant setting aside the forum-selection clause—that the agreement was "[a]ffected by fraud, undue influence, or overweening bargaining power"; that "enforcement would be unreasonable and unjust"; or that proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." *The Bremen*, 407 U. S., at

12, 15, 18. But absent such a showing—and none was attempted here—there is no basis for assuming the forum inadequate or its selection unfair.

Next, potential complexity should not suffice to ward off arbitration. We might well have some doubt that even the courts following *American Safety* subscribe fully to the view that antitrust matters are inherently insusceptible to resolution by arbitration, as these same courts have agreed that an undertaking to arbitrate antitrust claims entered into *after* the dispute arises is acceptable. See, *e. g.*, *Coenen* v. *R. W. Pressprich & Co.*, 453 F. 2d 1209, 1215 (CA2), cert. denied, 406 U. S. 949 (1972); *Cobb* v. *Lewis*, 488 F. 2d 41, 48 (CA5 1974). See also, in the present cases, 723 F. 2d, at 168, n. 12 (leaving question open). And the vertical restraints which most frequently give birth to antitrust claims covered by an arbitration agreement will not often occasion the monstrous proceedings that have given antitrust litigation an image of intractability. In any event, adaptability and access to expertise are hallmarks of arbitration. The anticipated subject matter of the dispute may be taken into account when the arbitrators are appointed, and arbitral rules typically provide for the participation of experts either employed by the parties or appointed by the tribunal.[17] Moreover, it is often a judgment that streamlined proceedings and expeditious results will best serve their needs that causes parties to agree to arbitrate their disputes; it is typically a desire to keep the effort and expense required to resolve a dispute within manageable bounds that prompts them mutually to forgo access to judicial remedies. In sum, the factor of potential com-

---

[17] See, *e. g.*, Japan Commercial Arbitration Association Rule 26, reprinted in App. 218–219; L. Craig, W. Park, & J. Paulsson, International Chamber of Commerce Arbitration §§ 25.03, 26.04 (1984); Art. 27, Arbitration Rules of United Nations Commission on International Trade Law (UNCITRAL) (1976), reprinted in 2 Yearbook Commercial Arbitration 167 (1977).

plexity alone does not persuade us that an arbitral tribunal could not properly handle an antitrust matter.

For similar reasons, we also reject the proposition that an arbitration panel will pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes. International arbitrators frequently are drawn from the legal as well as the business community; where the dispute has an important legal component, the parties and the arbitral body with whose assistance they have agreed to settle their dispute can be expected to select arbitrators accordingly.[18] We decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators.

We are left, then, with the core of the *American Safety* doctrine—the fundamental importance to American democratic capitalism of the regime of the antitrust laws. See,

---

[18] See Craig, Park, & Paulsson, *supra*, § 12.03, p. 28; Sanders, Commentary on UNCITRAL Arbitration Rules § 15.1, in 2 Yearbook Commercial Arbitration, *supra*, at 203.

We are advised by Mitsubishi and *amicus* International Chamber of Commerce, without contradiction by Soler, that the arbitration panel selected to hear the parties' claims here is composed of three Japanese lawyers, one a former law school dean, another a former judge, and the third a practicing attorney with American legal training who has written on Japanese antitrust law. Brief for Petitioner in No. 83–1569, p. 26; Brief for International Chamber of Commerce as *Amicus Curiae* 16, n. 28.

The Court of Appeals was concerned that international arbitrators would lack "experience with or exposure to our law and values." 723 F. 2d, at 162. The obstacles confronted by the arbitration panel in this case, however, should be no greater than those confronted by any judicial or arbitral tribunal required to determine foreign law. See, *e. g.*, Fed. Rule Civ. Proc. 44.1. Moreover, while our attachment to the antitrust laws may be stronger than most, many other countries, including Japan, have similar bodies of competition law. See, *e. g.*, 1 Law of Transnational Business Transactions, ch. 9 (Banks, Antitrust Aspects of International Business Operations), § 9.03[7] (V. Nanda ed. 1984); H. Iyori & A. Uesugi, The Antimonopoly Laws of Japan (1983).

*e. g., United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610 (1972); *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 4 (1958). Without doubt, the private cause of action plays a central role in enforcing this regime. See, *e. g., Hawaii* v. *Standard Oil Co.,* 405 U. S. 251, 262 (1972). As the Court of Appeals pointed out:

> "'A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest.'" 723 F. 2d, at 168, quoting *American Safety,* 391 F. 2d, at 826.

The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators. See, *e. g., Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 138–139 (1968).

The importance of the private damages remedy, however, does not compel the conclusion that it may not be sought outside an American court. Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act, 15 U. S. C. § 15, and pursued by Soler here by way of its third counterclaim, seeks primarily to enable an injured competitor to gain compensation for that injury.

> "Section 4 . . . is in essence a remedial provision. It provides treble damages to '[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . .' Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed. . . . It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a

multiple of the injury actually proved, is designed primarily as a remedy." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485–486 (1977).

After examining the respective legislative histories, the Court in *Brunswick* recognized that when first enacted in 1890 as § 7 of the Sherman Act, 26 Stat. 210, the treble-damages provision "was conceived of primarily as a remedy for '[t]he people of the United States as individuals,'" 429 U. S., at 486, n. 10, quoting 21 Cong. Rec. 1767–1768 (1890) (remarks of Sen. George); when reenacted in 1914 as § 4 of the Clayton Act, 38 Stat. 731, it was still "conceived primarily as 'open[ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered.'" 429 U. S., at 486, n. 10, quoting 51 Cong. Rec. 9073 (1914) (remarks of Rep. Webb). And, of course, the antitrust cause of action remains at all times under the control of the individual litigant: no citizen is under an obligation to bring an antitrust suit, see *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 746 (1977), and the private antitrust plaintiff needs no executive or judicial approval before settling one. It follows that, at least where the international cast of a transaction would otherwise add an element of uncertainty to dispute resolution, the prospective litigant may provide in advance for a mutually agreeable procedure whereby he would seek his antitrust recovery as well as settle other controversies.

There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism. To be sure, the international arbitral tribunal owes no prior allegiance to the legal norms of particular states; hence, it has no direct obligation to vindicate their statutory dictates. The tribunal, however, is bound to effectuate the intentions of the parties. Where the parties have agreed that the arbitral body is to decide a defined set of claims which includes, as in these cases, those arising from the application of American antitrust law, the tribunal there-

fore should be bound to decide that dispute in accord with the national law giving rise to the claim. Cf. *Wilko* v. *Swan,* 346 U. S., at 433–434.[19]  And so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.

---

[19] In addition to the clause providing for arbitration before the Japan Commercial Arbitration Association, the Sales Agreement includes a choice-of-law clause which reads: "This Agreement is made in, and will be governed by and construed in all respects according to the laws of the Swiss Confederation as if entirely performed therein." App. 56. The United States raises the possibility that the arbitral panel will read this provision not simply to govern interpretation of the contract terms, but wholly to displace American law even where it otherwise would apply. Brief for United States as *Amicus Curiae* 20. The International Chamber of Commerce opines that it is "[c]onceivabl[e], although we believe it unlikely, [that] the arbitrators could consider Soler's affirmative claim of anticompetitive conduct by CISA and Mitsubishi to fall within the purview of this choice-of-law provision, with the result that it would be decided under Swiss law rather than the U. S. Sherman Act." Brief for International Chamber of Commerce as *Amicus Curiae* 25. At oral argument, however, counsel for Mitsubishi conceded that American law applied to the antitrust claims and represented that the claims had been submitted to the arbitration panel in Japan on that basis. Tr. of Oral. Arg. 18. The record confirms that before the decision of the Court of Appeals the arbitral panel had taken these claims under submission. See District Court Order of May 25, 1984, pp. 2–3.

We therefore have no occasion to speculate on this matter at this stage in the proceedings, when Mitsubishi seeks to enforce the agreement to arbitrate, not to enforce an award. Nor need we consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinitiate suit in federal court. We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy. See, *e. g., Redel's Inc.* v. *General Electric Co.,* 498 F. 2d 95, 98–99 (CA5 1974); *Gaines* v. *Carrollton Tobacco Board of Trade, Inc.,* 386 F. 2d 757, 759 (CA6 1967); *Fox Midwest Theatres* v. *Means,* 221 F. 2d 173, 180 (CA8 1955). Cf. *Lawlor* v. *National Screen Service Corp.,* 349 U. S. 322, 329 (1955). See generally 15 S. Williston, Contracts § 1750A (3d ed. 1972).

Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed. The Convention reserves to each signatory country the right to refuse enforcement of an award where the "recognition or enforcement of the award would be contrary to the public policy of that country." Art. V(2)(b), 21 U. S. T., at 2520; see *Scherk*, 417 U. S., at 519, n. 14. While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them.[20]

As international trade has expanded in recent decades, so too has the use of international arbitration to resolve disputes arising in the course of that trade. The controversies that international arbitral institutions are called upon to resolve have increased in diversity as well as in complexity. Yet the potential of these tribunals for efficient disposition of legal disagreements arising from commercial relations has not yet been tested. If they are to take a central place in the international legal order, national courts will need to "shake off the old judicial hostility to arbitration," *Kulukundis Shipping Co.* v. *Amtorg Trading Corp.*, 126 F. 2d 978, 985 (CA2 1942), and also their customary and understandable unwillingness to cede jurisdiction of a claim arising under domestic law to a foreign or transnational tribunal. To this extent, at

---

[20] See n. 19, *supra.* We note, for example, that the rules of the Japan Commercial Arbitration Association provide for the taking of a "summary record" of each hearing, Rule 28.1; for the stenographic recording of the proceedings where the tribunal so orders or a party requests one, Rule 28.2; and for a statement of reasons for the award unless the parties agree otherwise, Rule 36.1(4). See App. 219 and 221.

Needless to say, we intimate no views on the merits of Soler's antitrust claims.

least, it will be necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration.    See *Scherk, supra.*[21]

[21] We do not quarrel with the Court of Appeals' conclusion that Art. II(1) of the Convention, which requires the recognition of agreements to arbitrate that involve "subject matter capable of settlement by arbitration," contemplates exceptions to arbitrability grounded in domestic law.    See 723 F. 2d, at 164–166; G. Gaja, International Commercial Arbitration: New York Convention I. B.2 (1984); A. van den Berg, The New York Convention of 1958: Towards a Uniform Judicial Interpretation 152–154 (1981); Contini, International Commercial Arbitration: The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 8 Am. J. Comp. L. 283, 296 (1959).    But see Van den Berg, *supra*, at 154, and n. 98 (collecting contrary authorities); Gaja, *supra*, at I. D., n. 43 (same).    And it appears that before acceding to the Convention the Senate was advised by a State Department memorandum that the Convention provided for such exceptions.    See S. Exec. Doc. E, 90th Cong., 2d Sess., 19 (1968).

In acceding to the Convention the Senate restricted its applicability to commercial matters, in accord with Art. I(3).    See 21 U. S. T., at 2519, 2560.    Yet in implementing the Convention by amendment to the Federal Arbitration Act, Congress did not specify any matters it intended to exclude from its scope.    See Act of July 31, 1970, Pub. L. 91–368, 84 Stat. 692, codified at 9 U. S. C. §§ 201–208.    In *Scherk*, this Court recited Art. II(1), including the language relied upon by the Court of Appeals, but paid heed to the Convention delegates' "frequent[ly voiced] concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements."    417 U. S., at 520, n. 15, citing G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24–28 (1958).    There, moreover, the Court dealt, *arguendo*, with an exception to arbitrability grounded in express congressional language; here, in contrast, we face a judicially implied exception.    The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own.    Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention.    But we decline to subvert the

Accordingly, we "require this representative of the American business community to honor its bargain," *Alberto-Culver Co. v. Scherk*, 484 F. 2d 611, 620 (CA7 1973) (Stevens, J., dissenting), by holding this agreement to arbitrate "enforce[able] . . . in accord with the explicit provisions of the Arbitration Act." *Scherk*, 417 U. S., at 520.

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of these cases.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, and with whom JUSTICE MARSHALL joins except as to Part II, dissenting.

One element of this rather complex litigation is a claim asserted by an American dealer in Plymouth automobiles that two major automobile companies are parties to an international cartel that has restrained competition in the American market. Pursuant to an agreement that is alleged to have violated § 1 of the Sherman Act, 15 U. S. C. § 1, those companies allegedly prevented the dealer from transshipping some 966 surplus vehicles from Puerto Rico to other dealers in the American market. App. 92.

Petitioner denies the truth of the dealer's allegations and takes the position that the validity of the antitrust claim must be resolved by an arbitration tribunal in Tokyo, Japan. Largely because the auto manufacturers' defense to the antitrust allegation is based on provisions in the dealer's franchise agreement, the Court of Appeals concluded that the arbitration clause in that agreement encompassed the antitrust

---

spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

claim.   723 F. 2d 155, 159 (CA1 1983).   It held, however, as a matter of law, that arbitration of such a claim may not be compelled under either the Federal Arbitration Act[1] or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.[2]   *Id.*, at 161–168.

This Court agrees with the Court of Appeals' interpretation of the scope of the arbitration clause, but disagrees with its conclusion that the clause is unenforceable insofar as it purports to cover an antitrust claim against a Japanese company.   This Court's holding rests almost exclusively on the federal policy favoring arbitration of commercial disputes and vague notions of international comity arising from the fact that the automobiles involved here were manufactured in Japan.   Because I am convinced that the Court of Appeals' construction of the arbitration clause is erroneous, and because I strongly disagree with this Court's interpretation of the relevant federal statutes, I respectfully dissent.   In my opinion, (1) a fair construction of the language in the arbitration clause in the parties' contract does not encompass a claim that auto manufacturers entered into a conspiracy in violation of the antitrust laws; (2) an arbitration clause should not normally be construed to cover a statutory remedy that it does not expressly identify; (3) Congress did not intend § 2 of the Federal Arbitration Act to apply to antitrust claims; and (4) Congress did not intend the Convention on the Recognition and Enforcement of Foreign Arbitral Awards to apply to disputes that are not covered by the Federal Arbitration Act.

I

On October 31, 1979, respondent, Soler Chrysler-Plymouth, Inc. (Soler), entered into a "distributor agreement" to govern the sale of Plymouth passenger cars to be manufactured by petitioner, Mitsubishi Motors Corpora-

---

[1] 9 U. S. C. §§ 4, 201.

[2] [1970] 21 U. S. T. 2517, T. I. A. S. No. 6997.

tion of Tokyo, Japan (Mitsubishi).[3]  Mitsubishi, however, was not a party to that agreement.  Rather the "purchase rights" were granted to Soler by a wholly owned subsidiary of Chrysler Corporation that is referred to as "Chrysler" in the agreement.[4]  The distributor agreement does not contain an arbitration clause.  Nor does the record contain any other agreement providing for the arbitration of disputes between Soler and Chrysler.

Paragraph 26 of the distributor agreement authorizes Chrysler to have Soler's orders filled by any company affiliated with Chrysler, that company thereby becoming the "supplier" of the products covered by the agreement with Chrysler.[5]  Relying on paragraph 26 of their distributor

---

[3] The distributor agreement provides, in part:

"This Agreement is made by and between CHRYSLER INTERNATIONAL S. A., a corporation organized and existing under the laws of the Swiss Confederation with its principal office in Geneva, Switzerland (hereinafter sometimes called CHRYSLER), and SOLER CHRYSLER-PLYMOUTH INC., . . . (hereinafter sometimes called DISTRIBUTOR), and will govern the sale by CHRYSLER to DISTRIBUTOR of PLYMOUTH PASSENGER CARS AND CAR DERIVATIVES MANUFACTURED BY MITSUBISHI MOTORS CORPORATION OF TOKYO, JAPAN and automotive replacement parts and accessories (said motor vehicles, replacement parts and accessories hereinafter sometimes called Products)."  App. 18.

[4] "PURCHASE RIGHTS

"Subject to the provisions of this Agreement, CHRYSLER grants to DISTRIBUTOR the non-exclusive right to purchase Products from CHRYSLER, and DISTRIBUTOR agrees to buy Products from CHRYSLER, for resale within the following described territory (hereinafter called Sales Area): METROPOLITAN SAN JUAN, PUERTO RICO . . . ." *Ibid.*

This is the same company that is referred to as "CISA" in the sales purchase agreement and in the Court's opinion.

[5] Paragraph 26 of the distributor agreement provides:

"DIRECT SALES

"CHRYSLER and DISTRIBUTOR agree that CHRYSLER may, at its option, forward orders received from DISTRIBUTOR pursuant to this Agreement to its parent company, Chrysler Corporation, or to any subsid-

agreement,[6] Soler, Chrysler, and Mitsubishi entered into a separate Sales Procedure Agreement designating Mitsubishi as the supplier of the products covered by the distributor agreement.[7] The arbitration clause the Court construes today is found in that agreement.[8] As a matter of ordinary contract interpretation, there are at least two reasons why that clause does not apply to Soler's antitrust claim against Chrysler and Mitsubishi.

First, the clause only applies to two-party disputes between Soler and Mitsubishi. The antitrust violation alleged in Soler's counterclaim is a three-party dispute. Soler has joined both Chrysler and its associated company, Mitsubishi, as counterdefendants. The pleading expressly alleges that

---

iary, associated or affiliated company (hereinafter called 'SUPPLIER') which will then sell the Products covered by such order directly to DISTRIBUTOR, CHRYSLER and DISTRIBUTOR hereby acknowledge and agree that, unless otherwise agreed in writing, any such direct sales between SUPPLIER and DISTRIBUTOR will be governed by the terms and conditions contained on the order form and in this Agreement and that any such sales will not constitute the basis forming a distributor relationship between SUPPLIER and DISTRIBUTOR. Further, DISTRIBUTOR acknowledges and agrees that any claim or controversy resulting from such direct sales by SUPPLIER will be handled by CHRYSLER as though such sale had been made by CHRYSLER." *Id.*, at 39–40.

[6] "WHEREAS, pursuant to Article 26 of the Distributor Agreement, CISA may forward orders received from BUYER to an associated company;

"WHEREAS, MMC and CISA have agreed that MMC, which is an associated company of CISA, may sell such MMC Products directly to BUYER pursuant to Article 26 of the Distributor Agreement." *Id.*, at 43.

[7] Mitsubishi is jointly owned by Chrysler and by Mitsubishi Heavy Industries, Ltd., a Japanese corporation. *Id.*, at 200–201.

[8] That clause reads as follows:

"ARBITRATION OF CERTAIN MATTERS

"All disputes, controversies or differences which may arise between MMC and BUYER out of or in relation to Articles I–B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association." *Id.*, at 52–53.

both of those companies are "engaged in an unlawful combination and conspiracy to restrain and divide markets in interstate and foreign commerce, in violation of the Sherman Antitrust Act and the Clayton Act." App. 91. It is further alleged that Chrysler authorized and participated in several overt acts directed at Soler. At this stage of the case we must, of course, assume the truth of those allegations. Only by stretching the language of the arbitration clause far beyond its ordinary meaning could one possibly conclude that it encompasses this three-party dispute.

Second, the clause only applies to disputes "which may arise between MMC and BUYER out of or in relation to Articles I–B through V of this Agreement or for the breach thereof . . . ." *Id.*, at 52. Thus, disputes relating to only 5 out of a total of 15 Articles in the Sales Procedure Agreement are arbitrable. Those five Articles cover: (1) the terms and conditions of direct sales (matters such as the scheduling of orders, deliveries, and payment); (2) technical and engineering changes; (3) compliance by Mitsubishi with customs laws and regulations, and Soler's obligation to inform Mitsubishi of relevant local laws; (4) trademarks and patent rights; and (5) Mitsubishi's right to cease production of any products. It is immediately obvious that Soler's antitrust claim did not arise out of Articles I–B through V and it is not a claim "for the breach thereof." The question is whether it is a dispute "in relation to" those Articles.

Because Mitsubishi relies on those Articles of the contract to explain some of the activities that Soler challenges in its antitrust claim, the Court of Appeals concluded that the relationship between the dispute and those Articles brought the arbitration clause into play. I find that construction of the clause wholly unpersuasive. The words "in relation to" appear between the references to claims that arise under the contract and claims for breach of the contract; I believe all three of the species of arbitrable claims must be predicated on contractual rights defined in Articles I–B through V.

The federal policy favoring arbitration cannot sustain the weight that the Court assigns to it. A clause requiring arbitration of all claims "relating to" a contract surely could not encompass a claim that the arbitration clause was itself part of a contract in restraint of trade. Cf. *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30 (1930); see also *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 176 (1948). Nor in my judgment should it be read to encompass a claim that relies, not on a failure to perform the contract, but on an independent violation of federal law. The matters asserted by way of defense do not control the character, or the source, of the claim that Soler has asserted.[9] Accordingly, simply as a matter of ordinary contract interpretation, I would hold that Soler's antitrust claim is not arbitrable.

## II

Section 2 of the Federal Arbitration Act describes three kinds of arbitrable agreements.[10] Two—those including maritime transactions and those covering the submission of an existing dispute to arbitration—are not involved in this case. The language of § 2 relating to the Soler-Mitsubishi arbitration clause reads as follows:

---

[9] Even if Mitsubishi can prove that it did not violate any provision of the contract, such proof would not necessarily constitute a defense to the antitrust claim. In contrast, in *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967), Prima Paint's claim of fraud in the inducement was asserted to rescind the contract, not as an independent basis of recovery.

[10] Section 2 provides:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2.

"A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The plain language of this statute encompasses Soler's claims that arise out of its contract with Mitsubishi, but does not encompass a claim arising under federal law, or indeed one that arises under its distributor agreement with Chrysler. Nothing in the text of the 1925 Act, nor its legislative history, suggests that Congress intended to authorize the arbitration of any statutory claims.[11]

Until today all of our cases enforcing agreements to arbitrate under the Arbitration Act have involved contract claims. In one, the party claiming a breach of contractual warranties also claimed that the breach amounted to fraud actionable under § 10(b) of the Securities Exchange Act of 1934. *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974).[12]

---

[11] In his dissent in *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S., at 415, Justice Black quoted the following commentary written shortly after the statute was passed:

"Not all questions arising out of contracts ought to be arbitrated. It is a remedy peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact—quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like. It has a place also in the determination of the simpler questions of law—the questions of law which arise out of these daily relations between merchants as to the passage of title, the existence of warranties, or the questions of law which are complementary to the questions of fact which we have just mentioned." Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 281 (1926).

In the *Prima Paint* case the Court held that the Act applied to a claim of fraud in the inducement of the contract, but did not intimate that it might also cover federal statutory claims. See n. 9, *supra.*

[12] "The dispute between these parties over the alleged shortage in defendant's inventory of European trademarks, a matter covered by contract

But this is the first time the Court has considered the question whether a standard arbitration clause referring to claims arising out of or relating to a contract should be construed to cover statutory claims that have only an indirect relationship to the contract.[18] In my opinion, neither the Congress that enacted the Arbitration Act in 1925, nor the many parties who have agreed to such standard clauses, could have anticipated the Court's answer to that question.

On several occasions we have drawn a distinction between statutory rights and contractual rights and refused to hold that an arbitration barred the assertion of a statutory right. Thus, in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), we held that the arbitration of a claim of employment discrimination would not bar an employee's statutory right to damages under Title VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000e–2000e–17, notwithstanding the strong federal policy favoring the arbitration of labor disputes. In that case the Court explained at some length why it would be unreasonable to assume that Congress intended to give arbitrators the final authority to implement the federal statutory policy:

> "[W]e have long recognized that 'the choice of forums inevitably affects the scope of the substantive right to be vindicated.' *U. S. Bulk Carriers* v. *Arguelles*, 400

---

warranties and subject to pre-closing verification, is the kind of commercial dispute for which arbitration is entirely appropriate. In my opinion, the fact that the 'fraud' language of Rule 10(b)(5) has been included in the complaint is far less significant than the desirability of having the Court of Arbitration of the International Chamber of Commerce in Paris, France, decide the various questions of foreign law which should determine the rights of these parties." *Alberto-Culver Co.* v. *Scherk*, 484 F. 2d 611, 619–620 (CA7 1973) (Stevens, J., dissenting), rev'd, 417 U. S. 506 (1974).

[18] It is interesting to note that in *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1 (1983), the Court referred to the standard clause describing claims "arising out of, or relating to, this Contract or the breach thereof" as a provision "for resolving disputes arising out of the contract or its breach." *Id.*, at 4–5.

U. S. 351, 359–360 (1971) (Harlan, J., concurring). Respondent's deferral rule is necessarily premised on the assumption that arbitral processes are commensurate with judicial processes and that Congress impliedly intended federal courts to defer to arbitral decisions on Title VII issues. We deem this supposition unlikely.

"Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation. . . . But other facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 581–583 (1960). Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts." 415 U. S., at 56–57 (footnote omitted).

In addition, the Court noted that the informal procedures which make arbitration so desirable in the context of contractual disputes are inadequate to develop a record for appellate review of statutory questions.[14] Such review is essential on

---

[14] "Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and

matters of statutory interpretation in order to assure consistent application of important public rights.

In *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728 (1981), we reached a similar conclusion with respect to the arbitrability of an employee's claim based on the Fair Labor Standards Act, 29 U. S. C. §§ 201–219. We again noted that an arbitrator, unlike a federal judge, has no institutional obligation to enforce federal legislative policy:

"Because the arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights.

"Finally, not only are arbitral procedures less protective of individual statutory rights than are judicial procedures, see *Gardner-Denver, supra*, at 57–58, but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief. Under the FLSA, courts can award actual and liquidated damages, reasonable attorney's fees, and costs. 29 U. S. C. § 216(b). An arbitrator, by contrast, can award only that compensation authorized by the wage provision of the collective-bargaining agreement. . . . It is most unlikely that he will be authorized to award liquidated damages, costs, or attorney's fees." 450 U. S., at 744–745 (footnote omitted).

procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. See *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198, 203 (1956); *Wilko* v. *Swan*, 346 U. S., at 435–437. And as this Court has recognized, '[a]rbitrators have no obligation to the court to give their reasons for an award.' *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U. S., at 598. Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." 415 U. S., at 57–58 (footnote omitted).

The Court has applied the same logic in holding that federal claims asserted under the Ku Klux Act of 1871, 42 U. S. C. § 1983, and claims arising under § 12(2) of the Securities Act of 1933, 15 U. S. C. § 77*l*(2), may not be finally resolved by an arbitrator. *McDonald* v. *City of West Branch,* 466 U. S. 284 (1984); *Wilko* v. *Swan,* 346 U. S. 427 (1953).

The Court's opinions in *Alexander, Barrentine, McDonald,* and *Wilko* all explain why it makes good sense to draw a distinction between statutory claims and contract claims. In view of the Court's repeated recognition of the distinction between federal statutory rights and contractual rights, together with the undisputed historical fact that arbitration has functioned almost entirely in either the area of labor disputes or in "ordinary disputes between merchants as to questions of fact," see n. 11, *supra,* it is reasonable to assume that most lawyers and executives would not expect the language in the standard arbitration clause to cover federal statutory claims. Thus, in my opinion, both a fair respect for the importance of the interests that Congress has identified as worthy of federal statutory protection, and a fair appraisal of the most likely understanding of the parties who sign agreements containing standard arbitration clauses, support a presumption that such clauses do not apply to federal statutory claims.

## III

The Court has repeatedly held that a decision by Congress to create a special statutory remedy renders a private agreement to arbitrate a federal statutory claim unenforceable. Thus, as I have already noted, the express statutory remedy provided in the Ku Klux Act of 1871,[15] the express statutory remedy in the Securities Act of 1933,[16] the express statutory remedy in the Fair Labor Standards Act,[17] and the express

---

[15] *McDonald* v. *City of West Branch,* 466 U. S. 284 (1984).

[16] *Wilko* v. *Swan,* 346 U. S. 427 (1953).

[17] *Barrentine* v. *Arkansas-Best Freight System, Inc.,* 450 U. S. 728 (1981).

statutory remedy in Title VII of the Civil Rights Act of 1964,[18] each provided the Court with convincing evidence that Congress did not intend the protections afforded by the statute to be administered by a private arbitrator. The reasons that motivated those decisions apply with special force to the federal policy that is protected by the antitrust laws.

To make this point it is appropriate to recall some of our past appraisals of the importance of this federal policy and then to identify some of the specific remedies Congress has designed to implement it. It was Chief Justice Hughes who characterized the Sherman Antitrust Act as "a charter of freedom" that may fairly be compared to a constitutional provision. See *Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344, 359–360 (1933). In *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 371 (1963), the Court referred to the extraordinary "magnitude" of the value choices made by Congress in enacting the Sherman Act. More recently, the Court described the weighty public interests underlying the basic philosophy of the statute:

> "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972).

[18] *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974).

The Sherman and Clayton Acts reflect Congress' appraisal of the value of economic freedom; they guarantee the vitality of the entrepreneurial spirit. Questions arising under these Acts are among the most important in public law.

The unique public interest in the enforcement of the antitrust laws is repeatedly reflected in the special remedial scheme enacted by Congress. Since its enactment in 1890, the Sherman Act has provided for public enforcement through criminal as well as civil sanctions. The pre-eminent federal interest in effective enforcement once justified a provision for special three-judge district courts to hear antitrust claims on an expedited basis, as well as for direct appeal to this Court bypassing the courts of appeals.[19] See, e. g., *United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S. 694 (1975).

The special interest in encouraging private enforcement of the Sherman Act has been reflected in the statutory scheme ever since 1890. Section 7 of the original Act,[20] used the broadest possible language to describe the class of litigants who may invoke its protection. "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 236 (1948); see also *Associ-*

---

[19] See 32 Stat. 823, 88 Stat. 1708, repealed 98 Stat. 3358 (Pub. L. 98–620, § 402(11)). The Act still provides an avenue for directly appealing to this Court from a final judgment in a Government antitrust suit. 15 U. S. C. § 29(b).

[20] "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." 26 Stat. 210.

The current version of the private remedy is codified at 15 U. S. C. § 15(a).

*ated General Contractors of California, Inc.* v. *Carpenters,* 459 U. S. 519, 529 (1983).

The provision for mandatory treble damages—unique in federal law when the statute was enacted—provides a special incentive to the private enforcement of the statute, as well as an especially powerful deterrent to violators.[21] What we have described as "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," *Lawlor* v. *National Screen Service Corp.,* 349 U. S. 322, 329 (1955), is buttressed by the statutory mandate that the injured party also recover costs, "including a reasonable attorney's fee." 15 U. S. C. § 15(a). The interest in wide and effective enforcement has thus, for almost a century, been vindicated by enlisting the assistance

---

[21] "We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211 (1951), that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. Similarly, in *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964), we held that a dealer whose consignment agreement was canceled for failure to adhere to a fixed resale price could bring suit under the antitrust laws even though by signing the agreement he had to that extent become a participant in the illegal, competition-destroying scheme. Both *Simpson* and *Kiefer-Stewart* were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct." *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 138–139 (1968).

of "private Attorneys General";[22] we have always attached special importance to their role because "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress." *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 262 (1972).

There are, in addition, several unusual features of the antitrust enforcement scheme that unequivocally require rejection of any thought that Congress would tolerate private arbitration of antitrust claims in lieu of the statutory remedies that it fashioned. As we explained in *Blumenstock Brothers Advertising Agency* v. *Curtis Publishing Co.*, 252 U. S. 436, 440 (1920), an antitrust treble-damages case "can only be brought in a District Court of the United States." The determination that these cases are "too important to be decided otherwise than by competent tribunals"[23] surely cannot allow private arbitrators to assume a jurisdiction that is denied to courts of the sovereign States.

---

[22] Under the Panama Canal Act, any private shipper—in addition to the United States—may also bring an action seeking to bar access to the canal for any vessel owned by a company "doing business" in violation of the antitrust laws. 37 Stat. 567, 15 U. S. C. § 31.

[23] In *University Life Insurance Co.* v. *Unimarc Ltd.*, 699 F. 2d 846 (CA7 1983), Judge Posner wrote:

"The suit brought by Unimarc and Huff . . . raises issues of state tort and contract law and federal antitrust law. The tort and contract issues may or may not be within the scope of the arbitration clauses in the coinsurance and second marketing agreements but they are arbitrable in the sense that an agreement to arbitrate them would be enforceable. Federal antitrust issues, however, are nonarbitrable in just that sense. *Applied Digital Technology, Inc.* v. *Continental Casualty Co.*, 576 F. 2d 116, 117 (7th Cir. 1978). They are considered to be at once too difficult to be decided competently by arbitrators—who are not judges, and often not even lawyers—and too important to be decided otherwise than by competent tribunals. See *American Safety Equipment Corp.* v. *J. P. Maguire & Co.*, 391 F. 2d 821, 826–27 (2d Cir. 1968). The root of the doctrine is in the same soil as the principle, announced in *Blumenstock Bros. Adv. Agency* v. *Curtis Pub. Co.*, 252 U. S. 436, 440–41 (1920), that federal antitrust suits may not be brought in state courts." *Id.*, at 850–851.

The extraordinary importance of the private antitrust remedy has been emphasized in other statutes enacted by Congress. Thus, in 1913, Congress passed a special Act guaranteeing public access to depositions in Government civil proceedings to enforce the Sherman Act. 37 Stat. 731, 15 U. S. C. § 30.[24] The purpose of that Act plainly was to enable victims of antitrust violations to make evidentiary use of information developed in a public enforcement proceeding. This purpose was further implemented in the following year by the enactment of § 5 of the Clayton Act providing that a final judgment or decree in a Government case may constitute prima facie proof of a violation in a subsequent treble-damages case. 38 Stat. 731, 15 U. S. C. § 16(a). These special remedial provisions attest to the importance that Congress has attached to the private remedy.

In view of the history of antitrust enforcement in the United States, it is not surprising that all of the federal courts that have considered the question have uniformly and unhesitatingly concluded that agreements to arbitrate federal antitrust issues are not enforceable. In a landmark opinion for the Court of Appeals for the Second Circuit, Judge Feinberg wrote:

> "A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest. . . . Antitrust violations can affect hundreds of thousands — perhaps millions — of people and inflict staggering economic damage. . . . We do not believe that Congress intended such claims to be resolved elsewhere than in the courts. We do not suggest that all antitrust litigations attain these swollen proportions; the courts, no less than the public, are thankful

[24] See *United States* v. *Procter & Gamble Co.*, 356 U. S. 677, 683 (1958).

that they do not. But in fashioning a rule to govern the arbitrability of antitrust claims, we must consider the rule's potential effect. For the same reason, it is also proper to ask whether contracts of adhesion between alleged monopolists and their customers should determine the forum for trying antitrust violations." *American Safety Equipment Corp.* v. *J. P. Maguire & Co.*, 391 F. 2d 821, 826–827 (1968) (footnote omitted).

This view has been followed in later cases from that Circuit[25] and by the First,[26] Fifth,[27] Seventh,[28] Eighth,[29] and Ninth Circuits.[30] It is clearly a correct statement of the law.

This Court would be well advised to endorse the collective wisdom of the distinguished judges of the Courts of Appeals who have unanimously concluded that the statutory remedies fashioned by Congress for the enforcement of the antitrust laws render an agreement to arbitrate antitrust disputes unenforceable. Arbitration awards are only reviewable for manifest disregard of the law, 9 U. S. C. §§ 10, 207, and the rudimentary procedures which make arbitration so desirable in the context of a private dispute often mean that the record is so inadequate that the arbitrator's decision is virtually

---

[25] *N. V. Maatschappij Voor Industriele Waarden* v. *A. O. Smith Corp.*, 532 F. 2d 874, 876 (1976) *(per curiam)*.

[26] 723 F. 2d 155, 162 (1983) (Coffin, J., for the court) (opinion below).

[27] *Cobb* v. *Lewis*, 488 F. 2d 41, 47 (1974) (Wisdom, J., for the court).

[28] *University Life Insurance Co.* v. *Unimarc Ltd.*, 699 F. 2d, at 850–851 (1983) (Posner, J., for the court); *Applied Digital Technology, Inc.* v. *Continental Casualty Co.*, 576 F. 2d 116, 117 (1978) (Pell, J., for the court).

[29] *Helfenbein* v. *International Industries, Inc.*, 438 F. 2d 1068, 1070 (Lay, J., for the court), cert. denied, 404 U. S. 872 (1971).

[30] *Lake Communications, Inc.* v. *ICC Corp.*, 738 F. 2d 1473, 1477–1480 (1984) (Browning, C. J., for the court); *Varo* v. *Comprehensive Designers, Inc.*, 504 F. 2d 1103, 1104 (1974) (Chambers, J., for the court); *Power Replacements, Inc.* v. *Air Preheater Co.*, 426 F. 2d 980, 983–984 (1970) (Jameson, J., for the court); *A. & E. Plastik Pak Co.* v. *Monsanto Co.*, 396 F. 2d 710, 715–716 (1968) (Merrill, J., for the court).

unreviewable.[31]  Despotic decisionmaking of this kind is fine for parties who are willing to agree in advance to settle for a best approximation of the correct result in order to resolve quickly and inexpensively any contractual dispute that may arise in an ongoing commercial relationship.  Such informality, however, is simply unacceptable when every error may have devastating consequences for important businesses in our national economy and may undermine their ability to compete in world markets.[32]  Instead of "muffling a grievance in the cloakroom of arbitration," the public interest in free competitive markets would be better served by having the issues resolved "in the light of impartial public court adjudication."  See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware,* 414 U. S. 117, 136 (1973).[33]

---

[31] The arbitration procedure in this case does not provide any right to evidentiary discovery or a written decision, and requires that all proceedings be closed to the public.  App. 220–221.  Moreover, Japanese arbitrators do not have the power of compulsory process to secure witnesses and documents, nor do witnesses who are available testify under oath.  *Id.,* at 218–219.  Cf. 9 U. S. C. § 7 (arbitrators may summon witnesses to attend proceedings and seek enforcement in a district court).

[32] The greatest risk, of course, is that the arbitrator will condemn business practices under the antitrust laws that are efficient in a free competitive market.  Cf. *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.,* 472 U. S. 284 (1985), rev'g 715 F. 2d 1393 (CA9 1983).  In the absence of a reviewable record, a reviewing district court would not be able to undo the damage wrought.  Even a Government suit or an action by a private party might not be available to set aside the award.

[33] The Court notes that some courts which have held that agreements to arbitrate antitrust claims generally are unenforceable have nevertheless enforced arbitration agreements to settle an existing antitrust claim.  *Ante,* at 633.  These settlement agreements, made after the parties have had every opportunity to evaluate the strength of their position, are obviously less destructive of the private treble-damages remedy that Congress provided.  Thus, it may well be that arbitration as a means of settling existing disputes is permissible.

## IV

The Court assumes for the purposes of its decision that the antitrust issues would not be arbitrable if this were a purely domestic dispute, *ante*, at 629, but holds that the international character of the controversy makes it arbitrable. The holding rests on vague concerns for the international implications of its decision and a misguided application of *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974).

### International Obligations of the United States

Before relying on its own notions of what international comity requires, it is surprising that the Court does not determine the specific commitments that the United States has made to enforce private agreements to arbitrate disputes arising under public law. As the Court acknowledges, the only treaty relevant here is the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. [1970] 21 U. S. T. 2517, T. I. A. S. No. 6997. The Convention was adopted in 1958 at a multilateral conference sponsored by the United Nations. This Nation did not sign the proposed convention at that time; displaying its characteristic caution before entering into international compacts, the United States did not accede to it until 12 years later.

As the Court acknowledged in *Scherk* v. *Alberto-Culver Co.*, 417 U. S., at 520, n. 15, the principal purpose of the Convention "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." However, the United States, as *amicus curiae*, advises the Court that the Convention "clearly contemplates" that signatory nations will enforce domestic laws prohibiting the arbitration of certain subject matters. Brief for United States as *Amicus Curiae* 28. This interpretation of the Convention was adopted by the Court of Appeals, 723 F. 2d, at 162–166, and the Court

declines to reject it, *ante,* at 639–640, n. 21. The construction is beyond doubt.

Article II(3) of the Convention provides that the court of a Contracting State, "when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration." This obligation does not arise, however, (i) if the agreement "is null and void, inoperative or incapable of being performed," Art. II(3), or (ii) if the dispute does not concern "a subject matter capable of settlement by arbitration," Art. II(1). The former qualification principally applies to matters of fraud, mistake, and duress in the inducement, or problems of procedural fairness and feasibility. 723 F. 2d, at 164. The latter clause plainly suggests the possibility that some subject matters are not capable of arbitration under the domestic laws of the signatory nations, and that agreements to arbitrate such disputes need not be enforced.

This construction is confirmed by the provisions of the Convention which provide for the enforcement of international arbitration awards. Article III provides that each "Contracting State shall recognize arbitral awards as binding and enforce them." However, if an arbitration award is "contrary to the public policy of [a] country" called upon to enforce it, or if it concerns a subject matter which is "not capable of settlement by arbitration under the law of that country," the Convention does not require that it be enforced. Arts. V(2)(a) and (b). Thus, reading Articles II and V together, the Convention provides that agreements to arbitrate disputes which are nonarbitrable under domestic law need not be honored, nor awards rendered under them enforced.[34]

---

[34] Indeed, it has been argued that a state may refuse to enforce an agreement to arbitrate a subject matter which is nonarbitrable in domestic law under Article II(3) as well as under Article II(1). Since awards rendered under such agreements need not be enforced under Article V(2) the agree-

This construction is also supported by the legislative history of the Senate's advice and consent to the Convention. In presenting the Convention for the Senate's consideration the President offered the following interpretation of Article II(1):

> "The requirement that the agreement apply to a matter capable of settlement by arbitration is necessary in order to take proper account of laws in force in many countries which prohibit the submission of certain questions to arbitration. In some States of the United States, for example, disputes affecting the title to real property are not arbitrable." S. Exec. Doc. E, at 19.

The Senate's consent to the Convention presumably was made in light of this interpretation, and thus it is to be afforded considerable weight. *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 184–185 (1982).

*International Comity*

It is clear then that the international obligations of the United States permit us to honor Congress' commitment to the exclusive resolution of antitrust disputes in the federal courts. The Court today refuses to do so, offering only vague concerns for comity among nations. The courts of other nations, on the other hand, have applied the exception provided in the Convention, and refused to enforce agreements to arbitrate specific subject matters of concern to them.[35]

---

ment is "incapable of being performed." Art. II(3). S. Exec. Doc. E, 90th Cong., 2d Sess., 19 (1968) (hereinafter S. Exec. Doc. E); G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards 27–28 (1958).

[35] For example, the Cour de Cassation in Belgium has held that disputes arising under a Belgian statute limiting the unilateral termination of exclusive distributorships are not arbitrable under the Convention in that country, *Audi-NSU Auto Union A. G.* v. *S. A. Adelin Petit & Cie.* (1979), in 5 Yearbook Commercial Arbitration 257, 259 (1980), and the Corte di

It may be that the subject-matter exception to the Convention ought to be reserved—as a matter of domestic law—for matters of the greatest public interest which involve concerns that are shared by other nations. The Sherman Act's commitment to free competitive markets is among our most important civil policies. *Supra*, at 650–657. This commitment, shared by other nations which are signatory to the Convention,[36] is hardly the sort of parochial concern that we should decline to enforce in the interest of international comity. Indeed, the branch of Government entrusted with the conduct of political relations with foreign governments has informed us that the "United States' determination that federal antitrust claims are nonarbitrable under the Convention . . . is not likely to result in either surprise or recrimination on the part of other signatories to the Convention." Brief for United States as *Amicus Curiae* 30.

Lacking any support for the proposition that the enforcement of our domestic laws in this context will result in international recriminations, the Court seeks refuge in an obtuse application of its own precedent, *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974), in order to defend the contrary result. The *Scherk* case was an action for damages brought by an American purchaser of three European businesses in which it was claimed that the seller's fraudulent representations concerning the status of certain European trademarks constituted a violation of § 10(b) of the Securities Exchange

Cassazione in Italy has held that labor disputes are not arbitrable under the Convention in that country, *Compagnia Generale Construzioni* v. *Piersanti*, [1980] Foro Italiano I 190, in 6 Yearbook Commercial Arbitration 229, 230 (1981).

[36] For example, the Federal Republic of Germany has a vigorous antitrust program, and prohibits the enforcement of predispute agreements to arbitrate such claims under some circumstances. See Act Against Restraints of Competition § 91(1), in 1 Organisation for Economic Cooperation and Development, Guide to Legislation on Restrictive Business Practices, Part D, p. 49 (1980). See also 2 G. Delaume, Transnational Contracts § 13.06, p. 31, and n. 3 (1982).

Act of 1934, 15 U. S. C. § 78j(b). The Court held that the parties' agreement to arbitrate any dispute arising out of the purchase agreement was enforceable under the Federal Arbitration Act. The legal issue was whether the Court's earlier holding in *Wilko* v. *Swan*, 346 U. S. 427 (1953)— "that an agreement to arbitrate could not preclude a buyer of a security from seeking a judicial remedy under the Securities Act of 1933," see 417 U. S., at 510—was "controlling authority." *Ibid.*

The Court carefully identified two important differences between the *Wilko* case and the *Scherk* case. First, the statute involved in *Wilko* contained an express private remedy that had "no statutory counterpart" in the statute involved in *Scherk*, see 417 U. S., at 513. Although the Court noted that this difference provided a "colorable argument" for reaching a different result, the Court did not rely on it. *Id.*, at 513–514.

Instead, it based its decision on the second distinction— that the outcome in *Wilko* was governed entirely by American law whereas in *Scherk* foreign rules of law would control and, if the arbitration clause were not enforced, a host of international conflict-of-laws problems would arise. The Court explained:

> "Alberto-Culver's contract to purchase the business entities belonging to Scherk was a truly international agreement. Alberto-Culver is an American corporation with its principal place of business and the vast bulk of its activity in this country, while Scherk is a citizen of Germany whose companies were organized under the laws of Germany and Liechtenstein. The negotiations leading to the signing of the contract in Austria and to the closing in Switzerland took place in the United States, England, and Germany, and involved consultations with legal and trademark experts from each of those countries and from Liechtenstein. Finally, and most significantly, the subject matter of the contract concerned the

sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets.

"Such a contract involves considerations and policies significantly different from those found controlling in *Wilko*. In *Wilko*, quite apart from the arbitration provision, there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement. The parties, the negotiations, and the subject matter of the contract were all situated in this country, and no credible claim could have been entertained that any international conflict-of-laws problems would arise. In this case, by contrast, in the absence of the arbitration provision considerable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract." 417 U. S., at 515–516 (footnote omitted).

Thus, in its opinion in *Scherk*, the Court distinguished *Wilko* because in that case "no credible claim could have been entertained that any international conflict-of-laws problems would arise." 417 U. S., at 516. That distinction fits this case precisely, since I consider it perfectly clear that the rules of American antitrust law must govern the claim of an American automobile dealer that he has been injured by an international conspiracy to restrain trade in the American automobile market.[37]

The critical importance of the foreign-law issues in *Scherk* was apparent to me even before the case reached this Court. See n. 12, *supra*. For that reason, it is especially distress-

---

[37] Cf. *Compagnia Generale Construzioni* v. *Piersanti*, [1980] Foro Italiano I 190 (Corte Cass. Italy), in 6 Yearbook Commercial Arbitration, at 230; *Audi-NSU Auto Union A. G.* v. *S. A. Adelin Petit & Cie.* (Cour Cass. Belgium 1979), in 5 Yearbook Commercial Arbitration, at 259.

ing to find that the Court is unable to perceive why the reasoning in *Scherk* is wholly inapplicable to Soler's antitrust claims against Chrysler and Mitsubishi. The merits of those claims are controlled entirely by American law. It is true that the automobiles are manufactured in Japan and that Mitsubishi is a Japanese corporation, but the same antitrust questions would be presented if Mitsubishi were owned by two American companies instead of by one American and one Japanese partner. When Mitsubishi enters the American market and plans to engage in business in that market over a period of years, it must recognize its obligation to comply with American law and to be subject to the remedial provisions of American statutes.[38]

The federal claim that was asserted in *Scherk*, unlike Soler's antitrust claim, had not been expressly authorized by Congress. Indeed, until this Court's recent decision in *Landreth Timber Co.* v. *Landreth*, 471 U. S. 681 (1985), the federal cause of action asserted in *Scherk* would not have been entertained in a number of Federal Circuits because it did not involve the kind of securities transaction that Congress intended to regulate when it enacted the Securities Exchange Act of 1934.[39] The fraud claimed in *Scherk* was virtually identical to the breach of warranty claim; arbitration of such claims arising out of an agreement between parties of equal bargaining strength does not conflict with any significant federal policy.

In contrast, Soler's claim not only implicates our fundamental antitrust policies, *supra*, at 650–657, but also should

---

[38] Cf. *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176 (1982) (Japanese general trading company's wholly owned subsidiary which is incorporated in the United States is not exempt under bilateral commercial treaty from obligations under Title VII of the Civil Rights Act of 1964).

[39] The Court's opinion in *Landreth Timber*, 471 U. S., at 694–695, n. 7, does not take issue with my assertion, in dissent, that Congress never "intended to cover negotiated transactions involving the sale of control of a business whose securities have never been offered or sold in any public market." *Id.*, at 699.

be evaluated in the light of an explicit congressional finding concerning the disparity in bargaining power between automobile manufacturers and their franchised dealers. In 1956, when Congress enacted special legislation to protect dealers from bad-faith franchise terminations,[40] it recited its intent "to balance the power now heavily weighted in favor of automobile manufacturers." 70 Stat. 1125. The special federal interest in protecting automobile dealers from overreaching by car manufacturers, as well as the policies underlying the Sherman Act, underscore the folly of the Court's decision today.

## V

The Court's repeated incantation of the high ideals of "international arbitration" creates the impression that this case involves the fate of an institution designed to implement a formula for world peace.[41] But just as it is improper to subordinate the public interest in enforcement of antitrust policy to the private interest in resolving commercial disputes, so is it equally unwise to allow a vision of world unity to distort the importance of the selection of the proper forum for resolving this dispute. Like any other mechanism for resolving controversies, international arbitration will only succeed if it is realistically limited to tasks it is capable of performing well—the prompt and inexpensive resolution of essentially contractual disputes between commercial partners. As for matters involving the political passions and the fundamental interests of nations, even the multilateral convention adopted under the auspices of the United Nations recognizes that private international arbitration is incapable of achieving satisfactory results.

---

[40] Automobile Dealer's Day in Court Act, 15 U. S. C. §§ 1221–1225.

[41] E. g., Charter of the United Nations and Statute of the International Court of Justice, 59 Stat. 1031, T. S. No. 993 (1945); Constitution of the International Labor Organisation, 49 Stat. 2712, T. S. No. 874 (1934); Treaty of Versailles, S. Doc. 49, 66th Cong., 1st Sess., pt. 1, pp. 8–17 (1919) (Covenant of the League of Nations); Kant, Perpetual Peace, A Philosophical Sketch, in Kant's Political Writings 93 (H. Reiss ed. 1971).

In my opinion, the elected representatives of the American people would not have us dispatch an American citizen to a foreign land in search of an uncertain remedy for the violation of a public right that is protected by the Sherman Act. This is especially so when there has been no genuine bargaining over the terms of the submission, and the arbitration remedy provided has not even the most elementary guarantees of fair process. Consideration of a fully developed record by a jury, instructed in the law by a federal judge, and subject to appellate review, is a surer guide to the competitive character of a commercial practice than the practically unreviewable judgment of a private arbitrator.

Unlike the Congress that enacted the Sherman Act in 1890, the Court today does not seem to appreciate the value of economic freedom. I respectfully dissent.