**MAYTAG CORPORATION, Plaintiff,**

v.

**TURBOCHEF TECHNOLOGIES, INC., Defendant.**

**No. CIV.4:02–CV–10217.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 23, 2002.

Mark E. Weinhardt, Belin Lamson McCormick, Des Moines, IA, for Plaintiff.

Randall G. Horstmann, Nyemaster Goode Voigts West Hansell & O'Brien PC, Des Moines, IA, for Defendant.

## ORDER

LONGSTAFF, Chief Judge.

Before the Court is defendant's motion to dismiss or, alternatively, to stay litigation. The motion was filed on July 8, 2002. Plaintiff filed a memorandum of law opposing defendant's motion on August 13, 2002. Defendant filed a reply on August 23, 2002. The Court held a hearing on matters relating to Count VI of Maytag's Complaint on December 19, 2002. The matter is now considered fully submitted.

## I. BACKGROUND

In September 1997, Maytag Corporation ("Maytag") and TurboChef Technologies Inc. ("TurboChef") entered into a Strategic Alliance Agreement ("SAA") whereby they agreed to cooperate in the development and commercialization of new products and technology in the areas of heat transfer, thermodynamics, and controls. *See* SAA § 1.1. The SAA anticipated that the parties would "discover or develop new product concepts or applications ... which could utilize the TurboChef Technologies in conjunction with the Maytag expertise." *Id.* The first project in which the parties pooled their efforts involved residential cooking appliances. *See* Residential Cooking Appliance Project Agreement ("RCAP"). Later, they entered into a similar deal involving commercial cooking appliances. *See* Commercial Cooking Appliance Project Agreement ("CCAP").

On or about October 28, 1999, the parties executed a License Agreement in which TurboChef granted Maytag the right to manufacture and sell certain "licensed products," and Maytag agreed to reimburse TurboChef for certain costs for the design and development of the "licensed products." The "licensed products" identified in the agreement include the "dual cavity flex oven," the "single cavity counter top cooking unit," and "substantially similar commercial cooking products." License Agreement, § 1.01. Both the SAA and the License Agreement con-

tained an arbitration clause, which provided that "[a]ny and all claims or controversies relating to this Agreement shall be finally resolved by arbitration." *Id.,* § 13.07; SAA, § 6.5.

Early in 2001, disputes arose between Maytag and TurboChef with respect to each party's performance, rights, and duties under the SAA, RCAP, CCAP and License Agreement. Consequently, on February 2, 2001, TurboChef filed an Arbitration Notice against Maytag, setting forth various claims. Maytag responded to TurboChef's Arbitration Notice on March 8, 2001 with its own Notice of Indemnification and Arbitration Notice. On January 22, 2002, TurboChef filed its First Amended Claim (in arbitration) against Maytag, alleging, among other things, that "Maytag somehow misused TurboChef's trade secrets in the design and development of its residential appliances, including but not limited to Maytag's line of Neptune washers and dryers." TurboChef's First Amended Claim Against Maytag, § VIII. That same day, TurboChef issued a press release containing the following statement:

> TurboChef Technologies, Inc.... announced today that it has filed an amended complaint [First Amended Claim in Arbitration] against Maytag Corporation for damages in excess of $900 million. The complaint, which will be arbitrated in Dallas Texas [sic], seeks injunctive relief and monetary damages resulting from Maytag's alleged use of TurboChef's intellectual technology in its residential appliances, including but not limited to, Neptune washers and dryers.
>
> The complaint also seeks damages for non-performance under a series of con-

tracts entered into between Maytag and TurboChef involving the development of commercial and residential ovens utilizing TurboChef's rapid cook technology. 'TurboChef seeks monetary damages and injunctive relief resulting from actions taken by Maytag and its employees beginning with the period of our initial agreement in October 1997. TurboChef believes that there is significant value in its intellectual property and management has a core strategy to defend and protect it,' commented Jeffrey Bogatin, Chairman and Chief Executive Officer of TurboChef.

Press Release of January 22, 2002. The next day, TurboChef issued a second press release labeled a "correction" of the first press release. The second press release materially differs from the first only in that it states that TurboChef alleges damages in excess of $300 million instead of damages in excess of $900 million.

On May 9, 2002, Maytag filed the present lawsuit, alleging that the statements made by TurboChef in the press release were false. Specifically, Maytag makes the following claims: false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); intentional interference with prospective business advantage (Count II); defamation (Count III); and unfair competition (Count IV). In Count V, Maytag seeks a declaratory judgment that Sections III and IV of TurboChef's First Amended Claim (in arbitration) are subject to arbitration proceedings in Massachusetts, not Texas. In Count VI, Maytag seeks a "declaratory judgment that claims 1–4 and 7–9 in the [First] Amended Claim" are arbitrable under the provisions of the License Agreement only.[1] Maytag's

---

1. In paragraph 23 of Maytag's First Amended Complaint, it indicates that "Amended Claim" refers to TurboChef's First Amended Claim Against Maytag in the Dallas Arbitration. However, upon reviewing TurboChef's First Amended Claim, the Court notes that claims 1–4 and 7–9 do not exist. The Court assumes

First Amended Complaint, at 16. Finally, in Count VII, Maytag brings a breach of contract claim, based on TurboChef's alleged nonpayment of the installment due on a promissory note. TurboChef filed the present motion to dismiss, or in the alternative, to stay the litigation.

## II. APPLICABLE LAW AND DISCUSSION

### i. Counts I–IV

 Counts I–IV are premised on Maytag's assertion that TurboChef's press release contained false and defamatory statements. As previously discussed, the press release summarized the arbitration claims TurboChef filed against Maytag, in which it accused Maytag of using TurboChef's intellectual property without permission. TurboChef argues that because Counts I–IV of Maytag's Complaint are contingent upon the resolution of issues that have already been submitted to the Dallas Arbitration, the Court should grant a stay of those counts. The Federal Arbitration Act provides that where a dispute is referable to arbitration by agreement of the parties, the court on motion of one of the parties "shall" stay the litigation "until such arbitration has been had" under the agreement. 9 U.S.C. § 3. The ·Court doubts that Counts I–IV are themselves referable to arbitration. Thus, a mandatory stay of those counts is likely not warranted. However, the Court need not decide that issue, because it finds that a discretionary stay is in order.

 The standard for granting a discretionary stay in deference to a pending arbitration is not well established. However, there are a few factors that courts typically consider. These include the extent to which the parties will be bound by the arbitration ruling, the risk of inconsis-

tent rulings, and the prejudice that may result from a stay. *AgGrow Oils, L.L.C. v. National Union Fire Ins.*, 242 F.3d 777, 783 (8th Cir.2000).

The first factor the Court will consider is the extent to which the parties will be bound by the outcome in the Dallas Arbitration. To determine the binding affect of the arbitration ruling, the Court must consider whether the parties agreed to resolve the misappropriation controversy in an arbitral forum. *See Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42 (3rd Cir.1985) ("Arbitration is a matter of contract, and parties are bound by arbitration awards only if they have agreed to arbitrate a matter.") The SAA and the License Agreement both contain arbitration clauses which provide, "Any and all claims or controversies relating to this Agreement shall be finally resolved by arbitration." SAA, § 6.5; License Agreement, § 13.07. The question is whether TurboChef's misappropriation allegations "relate to" either of these agreements.

The SAA and License Agreement pertain to the parties' alliance in the development of cooking appliances and "other related technologies." SAA, at 1; Licence Agreement, at 1. TurboChef's arbitration claims and the accompanying press releases accuse Maytag of misappropriating TurboChef's intellectual property and using it, not only in cooking appliances, but also in its washers and dryers. As Maytag explains it, TurboChef's claims "did not stay in the kitchen." Resistance to TurboChef's Motion to Resist or Stay, at 11. Even so, the Court is convinced that TurboChef's misappropriation claim is within the scope of the SAA and the License Agreement. The "related technology" at issue in those agreements included tech-

that Maytag was referring to claims 1–4 and 7–9 in TurboChef's original Claim Against Maytag in the Dallas Arbitration, which are similar to claims IIA–C and V–VII of Turbo-Chef's First Amended Claim in Arbitration.

nology in the areas of heat transfer, thermodynamics, and control. *See* SAA, at 1; License Agreement, at 1. In the Dallas Arbitration, TurboChef claims that Maytag misappropriated TurboChef's intellectual property and trade secrets, including layered logic and other control systems developed pursuant to the SAA.[2] Regardless of the fact that TurboChef accuses Maytag of misappropriating its protected intellectual property in products other than cooking appliances, the Court holds that Turbo-Chef's allegations "relate to" the SAA and the License Agreement. SAA, § 6.5; License Agreement, § 13.07 ("Any and all claims or controversies relating to this Agreement shall be finally resolved by arbitration."). *See Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); *Rivard Graphics Supply and Equipment, Inc. v. Hull Printing Co., Inc.*, 994 F.Supp. 118, 120 (Dist.Conn.1998) (stating that arbitration should be required "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotes omitted); and *Cybertek, Inc., v. Bentley Sys. Inc.*, 182 F.Supp.2d 864, 868 (D.Neb.2002) (recognizing the strong federal policy in favor of arbitration).

Because the parties agreed to arbitrate the claims that are pending in the Dallas Arbitration, the outcome of those proceedings will be binding on the parties. *See Val–U Construction Co. v. Rosebud Sioux Tribe*, 146 F.3d 573, 581 (8th Cir.1998) (holding that res judicata and collateral estoppel apply to arbitration award); and *Teamsters Local Union v. J.H. Merritt and Co.*, 770 F.2d 40, 42 (3rd Cir.1985) (holding that arbitration award is binding on the parties). *See also*, § 6.5(e) of the SAA ("to the extent permissible under applicable law, the decisions and award of the arbitrators shall be final and conclusive, and may be enforced in any court having prior jurisdiction ..."). The Court finds this factor weighs in favor of granting a stay.

Next, the Court considers the risk of inconsistent rulings. Whether Turbo-Chef's press release wrongfully accused Maytag of misappropriating intellectual property or trade secrets, or damaged Maytag under the provisions of the Lanham Act or under the common law, depends on facts that will be found and issues that will be resolved in the Dallas

**2.** Paragraph 67 of TurboChef's First Amended Claim in Arbitration provides in full:

Upon information and belief, TurboChef alleges that Maytag has incorporated and is using TurboChef's trade secrets in products, including but not limited to Neptune washing machines and dryers, now being manufactured and/or sold by Maytag and/or its subsidiaries and affiliates. Maytag does not have TurboChef's authority and approval to use TurboChef's trade secrets other than that granted in [the SAA and License Agreement], and Maytag has failed to pay to TurboChef reasonable royalties for the units Maytag manufactured and/or sold during the time Maytag was Misappropriating Tur-

boChef's trade secrets, to TurboChef's damage in an amount not less than $25,000,000.

In paragraph 53 of its Second Amended Claim (in arbitration), TurboChef further explains which trade secrets and other intellectual property Maytag allegedly misappropriated. "Such trade secrets and intellectual property include but are not limited to layered logic, U.S. Patent Application Serial No. 09/660,410 titled 'Menu Driven Control System for a Cooking Appliance,' *and any other intellectual property developed pursuant to the SAA, RCAP, RCAP2, and CCAP.* (emphasis added)."

Arbitration. Allowing Maytag to proceed to litigate Counts I–IV would require the Court to make findings on the misappropriation issue, which has already been submitted to arbitration. The risk of inconsistent rulings is apparent. Consequently, this factor militates in favor of granting a stay.

In its discretionary analysis, the Court must also consider whether Maytag would be prejudiced in the event of a stay. The only prejudice cited by Maytag is its assertion that it "may well have to wait years for an opportunity to clear its good name" if a stay is granted. Resistance to Turbo-Chef's Motion to Dismiss or Stay. The Court does not find this argument compelling. Maytag currently has an opportunity to "clear its good name" in the Dallas Arbitrate, the forum in which it agreed to arbitrate disputes over the misappropriation of TurboChef's control system technology.

The Court holds that the considerations in favor of granting a stay of Counts I–IV outweigh any prejudice to Maytag that may result from a stay. The Court therefore grants TurboChef's motion to stay Counts I–IV of Maytag's Complaint pending resolution of the misappropriation claims previously submitted to arbitration in Dallas, Texas.

### ii. Count V

In Count V, Maytag seeks a declaratory judgment that Sections III and IV of TurboChef's Amended Claim (in arbitration) are not subject to arbitration in Dallas. Since the filing of Maytag's Complaint, Turbochef has removed these claims from the Dallas Arbitration. Count V is moot and is therefore dismissed.

### iii. Count VI.

██ In Count VI, Maytag seeks a declaratory judgment that the Dallas Arbitration must proceed solely under the terms of the License Agreement, without reference to any of the parties' other agreements. Section 13.07 of the Licence Agreement provides that "any and all claims or controversies relating to this Agreement shall be finally resolved by arbitration." Maytag alleges that the License Agreement incorporates by reference the CCAP and the SAA, and the SAA incorporates by reference the RCAP. It follows, Maytag argues, that all of the agreements between the parties fall under the umbrella of the License Agreement.

The question now before the court is a narrow one—*who* should decide which contract governs the Dallas Arbitration proceedings? Maytag wants the Court to decide. TurboChef, on the other hand, contends that the arbitrator should make that determination. The question is unique. At the December 19th hearing, both TurboChef's and Maytag's attorneys admitted that they were unable to find a case addressing this precise question. The Court also found no case law directly on point.

Maytag argues that the Supreme Court's decision in *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) should guide the court's analysis. ·*See* Resistance to TurboChef's Motion to Dismiss or Stay at 16. There, the question was whether the court or the arbitrator should have the primary power to decide whether the parties agreed to submit a dispute to arbitration. *Id.* at 943, 115 S.Ct. 1920. The Court stated that the answer to that question hinges upon whether the parties agreed to arbitrate that matter. *Id.* at 943, 115 S.Ct. 1920. The Court noted, however, that "the law treats silence or ambiguity about the question 'who (primarily) should decide *arbitrability*' differently from the way it treats silence or ambiguity about ... merits-related dis-

pute[s]." *Id.* at 944–45, 115 S.Ct. 1920. (emphasis added). In determining whether a particular merits-related dispute is within the scope of a valid arbitration agreement, the Court noted that there is a presumption in favor of arbitration. The presumption is reversed when considering the threshold question of arbitrability. The Court advised that "[c]ourts should not assume that the parties agreed to arbitrate *arbitrability* unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944 (quoting *AT & T Technologies, Inc. v. Communications Workers of Am.,* 106 S.Ct. at 1418–1419) (emphasis added).

Arbitrability is not in dispute in the case at bar. Both Maytag and TurboChef agree that the claims *are* subject to arbitration. Instead, the dispute is about which contract should govern the arbitration proceedings. Because the threshold question of arbitrability is not at issue, the reverse presumption set forth in *First Options* is inapplicable and traditional arbitration principles govern.

The contracts between the parties do not specify who should determine which contract governs the arbitration in the event such a dispute arises. However, § 13.07 of the Licence Agreement provides that "any and all claims or controversies relating to this Agreement shall be finally resolved by arbitration." The parties' disagreement about whether the License Agreement trumps all related agreements is a "controvers[y] relating to" the License Agreement. *Id. See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (quoting *Moses H. Cone Memorial Hospital v. Mercury Contr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitra-

tion."). Because the Court finds that the question presented is within the scope of the arbitration clause, TurboChef's motion to stay Count VI of Maytag's complaint is granted.

#### iv. Count VII

■ In Count VII,[3] Maytag claims that TurboChef failed to pay the installment due on a promissory note on May 29, 2002. Maytag alleges that as a result of the breach, it incurred more than $327,478 in damages. The Asset Purchase Agreement and the promissory note it incorporates contain provisions by which the parties agreed to the jurisdiction of a court, not an arbitrator, to decide disputes. *See* Promissory Note, at 3. The sale of assets upon which Count VII is based occurred in November 2001, almost one year after the parties ceased performing under their other agreements and exchanged arbitration notices. Because Count VII is not intertwined with the Dallas Arbitration, no interest would be served by staying Count VII during the pendency of the arbitration. Therefore, TurboChef's motion to dismiss or stay Count VII is denied.

### III. CONCLUSION

TurboChef's motion to stay Counts I–IV and Count VI is granted pending resolution of the misappropriation claims previously submitted to arbitration. Count V is moot and is therefore dismissed. TurboChef's motion to stay or dismiss Count VII is denied.

IT IS SO ORDERED.

### ORDER

On December 30, 2002, the Court dismissed Count V and ordered a stay of Counts I–IV and VI of Maytag's First Amended Complaint. The motion to dis-

---

**3.** Maytag filed its First Amended Complaint adding Count VII on August 28, 2002.

miss or stay Count VII was denied. At the December 19th hearing, the Court advised TurboChef that it had until January 2, 2003 to resist Maytag's motion for summary judgment as to Count VII. TurboChef did not resist. Therefore, judgment is entered in favor of Maytag on Count VII in the amount of $359,371.66 plus additional accrued interest and costs.

IT IS SO ORDERED.