990 So.2d 820 (2008)
David Michael ANDREWS, Appellant,
v.
Tina FORD, Administratrix of the Estate of Robert Lee Ford, III, Deceased, Appellee.
No. 2007-CA-00497-COA.
Court of Appeals of Mississippi.
September 23, 2008.
James Gary McGee, attorney for appellant.
*821 R. Andrew Taggart, attorney for appellee.
Before KING, C.J., GRIFFIS and CARLTON, JJ.
GRIFFIS, J., for the Court.
¶ 1. David Michael Andrews filed a motion to compel arbitration. The circuit court denied the motion. On interlocutory appeal, Andrews argues that the circuit court's denial of his motion to compel arbitration was in error. We find no error and affirm.

FACTS
¶ 2. On September 12, 2000, Andrews and Robert Lee Ford III ("Ford") formed a company known as Sleep World, LLC ("Sleep World"). On that day, they both signed: (1) a Buy-Sell Agreement and (2) an Operating Agreement.
¶ 3. Ford died on November 7, 2005. Ford's wife, Tina Ford ("Tina"), was appointed as the administratrix of his estate.
¶ 4. On May 24, 2006, Tina, as administratrix of Ford's estate, commenced a lawsuit in the Circuit Court of Rankin County against Andrews. Tina asserted two claims. The first claim was for breach of contract for Andrews's failure to pay the purchase price as determined by the Buy-Sell Agreement. The second claim asked the court to order specific performance of the Buy-Sell Agreement. In essence, the complaint asserted that under the Buy-Sell Agreement, Andrews was required to purchase Ford's fifty percent interest in Sleep World. The complaint also asserted that the purchase price was to be calculated according to the terms of that agreement.
¶ 5. On July 19, 2006, Andrews filed his answer and affirmative defenses. Andrews did not assert a defense on the grounds that this case should be arbitrated according to the terms of the Buy-Sell Agreement or the Operating Agreement. The failure to assert this defense was not objected to by the plaintiff. Therefore, Andrews's failure to raise an affirmative defense in his responsive pleading does not preclude the consideration of this matter on appeal.
¶ 6. On November 20, 2006, Andrews filed a motion to compel arbitration. The motion was denied by the court's order of March 8, 2007.

ANALYSIS

I. Should the Buy-Sell Agreement be construed with the Operating Agreement?
¶ 7. Andrews argues that Tina's breach-of-contract claim based on the Buy-Sell Agreement should be submitted to arbitration because: (1) the Operating Agreement contains an arbitration clause; and (2) the Operating Agreement and the Buy-Sell Agreement are, in fact, one integrated contract.
¶ 8. Andrews relies on the case of Sullivan v. Protex Weatherproofing, Inc., 913 So.2d 256 (Miss.2005). In Sullivan, the supreme court held that an employment agreement's arbitration clause also applied to suits based on a buy-sell agreement because the two contracts were integrated and executed at the same time. Id. at 261(¶ 33). The Sullivan court relied on the case of Sullivan v. Mounger, 882 So.2d 129 (Miss.2004). Mounger adopted the principle that "separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." Mounger, 882 So.2d at 135(¶ 32) (quoting Neal v. Hardee's Food Sys., Inc., 918 F.2d 34, 37 (5th Cir.1990)).
¶ 9. Here, the Operating Agreement specifically references the Buy-Sell Agreement. *822 In section 9.2, the Operating Agreement states, "[u]pon death of a Member, purchasing of the deceased Member's ownership interest shall be in accordance with that certain BUY-SELL AGREEMENT executed by the Members and attached hereto as Exhibit `A.'" Both of these documents were drafted to create Sleep World and to establish the rights, duties, obligations, and responsibilities of the "Members" of Sleep World. Further, the record clearly reflects that both of the agreements were part of the same transaction, i.e., the formation of Sleep World. Therefore, we will construe the Buy-Sell Agreement with the Operating Agreement because both documents were executed on the same day, for the same purpose, and as part of the same transaction.

II. Is the motion to compel arbitration valid?
¶ 10. This Court "review[s] de novo the grant or denial of a petition to compel arbitration." Sullivan, 913 So.2d at 257(¶ 9). "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." East Ford, Inc. v. Taylor, 826 So.2d 709, 713(¶ 9) (Miss.2002). Under the second prong, we consider whether or not "legal constraints external to the parties' agreement foreclosed arbitration of those claims." Id. at (¶ 10) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Here, our decision is limited to the first prong. There is no argument based on the second prong.
¶ 11. To determine whether there was a valid arbitration agreement, we examine both the Buy-Sell Agreement and the Operating Agreement. The Buy-Sell Agreement is less than two pages. There are five sections: (1) Interest of Shareholder, (2) Transfer During Lifetime, (3) Death of Member, (4) Determination of Price, and (5) Payment. Section TWO (b), Transfer During Lifetime, provides that any disagreement that relates to the disability of a member may be submitted to arbitration. The arbitration provision is limited to section TWO (b). No other part of the Buy-Sell Agreement references or authorizes arbitration. There was neither a general arbitration provision nor a reference to the Operating Agreement. Section THREE of the Buy-Sell Agreement provides:
DEATH OF A MEMBER. On the death of any member, the other member shall purchase the member's entire interest in the corporation [actually Sleep World is a limited liability company] for a price and on terms as determined in Section Four.
¶ 12. The Operating Agreement is approximately nineteen pages. There are several sections that are relevant to this controversy.
ARTICLE I
DEFINITIONS
Section 1.8. Member shall mean a person that has been admitted to the Limited Liability Company as provided in Section 79-29-301 Miss.Code Ann.
....
ARTICLE IX
ASSIGNMENT OF INTEREST
Section 9.1. Restriction on Assignment. No Member shall have the right to sell, assign, pledge, hypothecate, transfer, exchange, gift, bequeath or otherwise transfer (by voluntary or involuntary *823 means) all or any part of his Limited Liability Company interests, except in accordance with that certain BUY-SELL AGREEMENT, executed by the Members and attached hereto as Exhibit "A."
Section 9.2. Death of Member. Upon the death of a Member, purchase of the deceased Members' ownership interest shall be in accordance with that certain BUY-SELL AGREEMENT, executed by the Members and attached hereto as Exhibit "A."
....
Section 9.6. Assignee not Member in Absence of Consent. Notwithstanding any provision contained in this Operating Agreement to the contrary unless the Members owning 51% of the Limited Liability Company interests then owned by the non-assigning Members grant their written consent to any assignment of a Limited Liability Company interest to an assignee who is not a Member immediately before the assignment, the proposed assignee shall have no right to participate in the management of the business and affairs of the Company or to become or exercise any rights of a Member. An assignee shall merely be entitled, to the extent assigned, to share in the net profits and net losses and to receive such distribution to which the assignor would have been entitled.
....
ARTICLE XII
MISCELLANEOUS
....
Section 12.2. Arbitration. For purposes of this Operating Agreement, "Dispute" shall mean any disagreement or deadlock among the Members relating to (i) this Operating Agreement, (ii) the Company or (iii) the rights and duties of the Members in their capacity as Members, Manager, agents, employees, or officers of the Company. If any Dispute arises between the Members and the Members cannot amicably resolve the Dispute between or among themselves, one or more Members may require resolution of the Dispute by arbitration in accordance with the rules set forth herein. The following rules shall govern every arbitration hereunder:....
¶ 13. Under the first prong of East Ford, Inc., it is clear that there is a valid arbitration agreement for the court to consider. Thus, we must determine whether the parties' dispute is within the scope of the arbitration agreement.
¶ 14. The Operating Agreement makes it clear that Ford's status as a "Member" in Sleep World, LLC does not automatically transfer upon his death. In fact, Ford may neither transfer nor bequeath his interest at his death. His death triggers the Buy-Sell Agreement, which establishes the price to be paid for Ford's membership interest.
¶ 15. Section 1.8 of the Operating Agreement defines a "Member" as "a person that has been admitted to the ... company." Section 9.1 provides that a "Member" may not "transfer, ..., gift, bequeath or otherwise transfer" his interest in the company "except in accordance with that certain BUY-SELL AGREEMENT." Section 9.6 recognizes that after Ford's death, Ford's estate is not a "Member," but it may be considered a potential assignee. As such, Ford's estate "shall have no right to participate in the management of the business and affairs of the Company or to become or exercise any rights of a Member. An assignee shall merely be entitled, to the extent assigned, to share in the net profits and net losses and to receive such distribution to which the assignor would have been entitled." *824 These provisions clearly indicate that at Ford's death, his estate or any heirs are not granted the rights, obligations, and responsibilities of a "Member." Ford's estate, the plaintiff and appellee, is not a "Member" of Sleep World.
¶ 16. The status of Ford's estate under the Operating Agreement is crucial to our determination of whether the parties' dispute is within the scope of the arbitration agreement. The second sentence of section 12.2 provides the scope of arbitration: "If any Dispute arises between the Members and the Members cannot amicably resolve the Dispute between or among themselves, one or more Members may require resolution of the Dispute by arbitration in accordance with the rules set forth herein." (Emphasis added). Thus, this portion of the arbitration clause only provides for arbitration of a "Dispute" between the "Members." The claims asserted by Ford's estate against Andrews are not a "Dispute" between the "Members."
¶ 17. Further, the first sentence of section 12.2 limits a "Dispute" that may be subject to arbitration to three specific types of conflicts: "`Dispute' shall mean any disagreement or deadlock among the Members relating to (i) this Operating Agreement, (ii) the Company or (iii) the rights and duties of the Members in their capacity as Members, Manager, agents, employees, or officers of the Company." (Emphasis added). Since Ford's estate is excluded by the specific terms of the Operating Agreement from being considered a "Member," Ford's estate cannot then be considered a "Member" for the purpose of this provision. As such, Ford's estate is not within the scope of the arbitration provision of the Operating Agreement.
¶ 18. In B.C. Rogers Poultry, Inc. v. Wedgeworth, 911 So.2d 483, 487(¶ 8) (Miss. 2005), the Mississippi Supreme Court held:
Our law requires this Court to accept the plain meaning of a contract as the intent of the parties if no ambiguity exists. I.P. Timberlands Operating Co. v. Denmiss Corp., 726 So.2d 96, 108 (Miss.1998). Furthermore, "contracts are solemn obligations and the Court must give them effect as written." Id. We agree with the U.S. Supreme Court that, "we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." EEOC v. Waffle House, Inc., 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002).
¶ 19. When the Buy-Sell Agreement and the Operating Agreement are construed together, we find that the parties did not intend for the arbitration clause in the Operating Agreement to apply to Ford's estate. Section THREE of the Buy-Sell Agreement requires the sale of a "Member's" interest in Sleep World on his death. The Operating Agreement precludes a "Member" from assigning, transferring, or bequeathing his interest. Thus, a deceased "Member" may never leave his interest in Sleep World to his heirs.
¶ 20. The Mississippi Supreme Court, quoting the United States Supreme Court, has held that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." B.C. Rogers Poultry, Inc., 911 So.2d at 487-88(¶ 11) (quoting AT & T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). Even though we are required under Sullivan and Mounger to construe the Buy-Sell Agreement and the Operating Agreement together, this does not mean that the arbitration clause in one document automatically applies to all of the provisions in the other document.
*825 ¶ 21. Indeed, we find that the arbitration provision in section 12.2 of the Operating Agreement does not require arbitration of an action brought by Ford's estate against Andrews. Therefore, we affirm the circuit court's order denying Andrews's motion to compel arbitration.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.